CRUMP *v.* TOLBERT.

4-8008                                    198 S. W. 2d 518

Opinion delivered December 16, 1946.

*M. P. Watkins,* for appellant.

*Maddox & Greer,* for appellee.

GRIFFIN SMITH, Chief Justice. The principal questions are: (a) Did M. T. Loggains as lessee of eighty acres have a right to assign the interest? (b) If such authority were not implicit in the written contract, would an indorsement by Loggains, made after he had assigned, have the effect of waiving the lessor's objections? (c) If the act of assigning was wrongful, what amount would be due as rentals?

In December, 1942, J. W. Guest loaned Mrs. Lydian Tolbert $3,000 at four percent, secured by mortgage. The obligation was due December 1, 1943, but Guest did not press for payment. Instead, he joined with Mrs. Tolbert in a lease to Loggains, whose term began January 1, 1944, and ended December 31, 1947. Guest died intestate in July, 1944. G. B. Knott was appointed administrator. Knott, acting with the Guest heirs, sold the note and assigned the mortgage to J. M. Crump and R. R. Murray for $2,250, with Probate Court approval. This occurred December 23, 1944. Five days later, for a recited consideration of $2,000, Loggains undertook to transfer his unexpired leasehold to Crump and Murray. By the transactions appellants (Crump and Murray) became owners of the Tolbert note with the land as mortgage security, and acquired whatever rights Loggains could convey in the lease.

Loggains needed more water on the eighty-acre tract than was available for rice culture, but did not require as much as might be expected from a well he proposed to provide and equip. The Tolbert-Loggains lease, as

originally drawn, reserved to the lessor a fourth of the rice, there being no mention of any other crop. On the contrary, paragraph five is a stipulation that Loggains ". . . will use said lands for the production of rice, . . . and will [apply the] diligence and skill usual in such agricultural industry in [the rice territory near Harrisburg"].

Paragraph seven obligates Loggains to "put down" a twelve-inch turbine rice well at a cost of approximately $1,935. Since, in contemplation, (and as a matter of fact) watering facilities would then be abundant, Loggains and Mrs. Tolbert made written contracts with John D. Smith and Charlie Easley. Loggains agreed to farm these designated tracts which adjoined Mrs. Tolbert. By oral agreement Loggains cultivated another contiguous farm, owned by John Burton, water in each case to come from the Tolbert property. The written contracts with Smith and Easley are not abstracted. However, appellants state in their brief that these contracts (and presumptively the Burton lease) are not involved except to the extent that Mrs. Tolbert claims she is entitled to credits equal to five percent of the rice, Loggains having retained sales proceeds to apply on cost of the well.

It is not disputed that the well, with equipment, represented an investment of $2,165.50. Plan of repayment was that Loggains take "the proceeds of one fourth rent in each of the years of the term of this lease." (Sec. 8). Sections 8 and 9 of the contract are printed in full in the footnote.[1]

---

[1] (Paragraph 8). It is mutually agreed and understood by and between the parties hereto that the cost of said rice well of approximately $1,935, to be advanced by the lessee, shall be repaid to the lessee out of the proceeds of one fourth rent in each of the years of the term of this lease until the said lessee is fully repaid and reimbursed for the entire cost of the construction of said rice well, and the lessee is hereby authorized to retain and hold out the said one fourth rent in each of said years of the term hereof until he has been fully reimbursed and repaid for the cost of said well.

(Paragraph 9). The lessee agrees to furnish a tractor or other power unit to pump water from said well to irrigate said rice so planted and sown on said lands, and the lessor agrees to pay on the cost of pumping said water and for the furnishing said power unit by the lessee one twentieth of the amount of rice in kind paid as rent or the proceeds of the sale of the amount of rice paid as rent each

The Tolbert-Guest-Loggains lease appears twice in the bill of exceptions, first as an exhibit to Mrs. Tolbert's testimony, and again, seemingly,[2] in connection with Crump's explanation of the assignment. The Crump exhibit is the original contract between Mrs. Tolbert, Loggains, and Guest. Paragraph *eight,* as shown by the stenographic (first) copy—and as disclosed by the original made available for comparison—is bracketed with a pen; and in the limited space between paragraphs eight and nine there is penned, "Lessors pay nothing for water rights." In respect of the original lease introduced with Crump's testimony, paragraph *nine* is enclosed in penned brackets, with the interlineation, written in ink: "Lessors pay nothing for water rights." Difference is that on Mrs. Tolbert's contract the added matter is between paragraphs eight and nine, while as to the second exhibit it is between paragraphs nine and ten. Still another dissimilarity is that in paragraphs three and four of Mrs. Tolbert's copy rental is fixed at one-fourth, while in the Crump exhibit (paragraph three) "fourth"—as originally written, followed by "¼²" in parentheses—has been changed. "Fifth" has been added with ink over "fourth," and a "5" covers the numeral "4." It is significant that "one fourth" in paragraph four of the Crump exhibit was not changed. The expression also appears twice in paragraph eight without change; nor is there an alteration in Mrs. Tolbert's copy other than the bracketing of paragraph eight, and the condition that nothing is to be paid by the lessor for water rights.

*First (a).*—Was the lease assignable? It will have been observed that Loggains' purpose was to invest Crump and Murray with his unexpired interest as distinguished from subletting. Distinction between assignment and sublease goes to quantity of interest passing by the transfer. An assignment conveys the entire estate

year, and that the same shall be retained by the lessee and applied to the cost of the construction of said rice well until the lessee is reimbursed for the entire cost of said rice well. One twentieth of the rent is to be paid lessee by lessor on the cost of pumping water and as compensation for furnishing the power unit by the lessee.

[2] The word "seemingly" is used because there are no stenographic filing marks or other evidence of the precise manner of introduction.

held by the assignor. In subletting, only a portion of the term or a part of the property is involved. *Cities Service Oil Company* v. *Taylor,* 242 Ky. 157, 45 S. W. 2d 1039, 79 A. L. R., p. 1374.

American Jurisprudence, "Landlord and Tenant," v. 32, § 319, and publications of a similar nature, construe a majority of the decisions to hold that in the absence of statutory restriction, or of a restriction on the right of assignment fixed by the parties, a tenant under a lease for a definite term has, as an incident to his estate, the right to assign his leasehold interest in the demised premises without the consent of the lessor. "This right of a tenant to assign," it is said, "exists at common law notwithstanding any common-law limitation upon a right to assign contracts, for although a lease is necessarily a contract, yet it is a contract which creates an estate. The right is not dependent on the use of the word 'assigns' in the lease, but exists absolutely, in the absence of contractual stipulations, or statutory prohibition." But there is another principle, and we think it has application here. Section 320, American Jurisprudence, has this to say:

"Notwithstanding the general rule that the power of assignment is incident to the estate of a lessee of real property unless it is restrained by statute or the terms of the lease, a lease of land on shares, including the use of buildings, farm implements, stock, and other personal property, is regarded as a personal contract and is not assignable without the consent of the lessor, for the reason that the amount to be received by the lessor and the care of the property depend on the character, industry, and skill of the lessee. But where the original lease runs to the lessee and his assigns, or where the crop has been harvested and marketed, the lease is assignable."

A footnote to the quoted text cites *Tipton* v. *Martzell,* 21 Wash. 273, 57 Pac. 806, 75 Am. St. Rep. 838, and contains this comment: "[The question at issue] was whether a growing crop was subject to levy under an execution against a tenant, [and] the Court stated the rule as to the assignability [of a lease] as follows:

'. . . There was an existing contract between the landlord and the respondents that they would properly take care of the growing grain, and harvest and deliver one third of the product to the landlord. In a contract of this nature the landlord depends on the character and skill of the lessee, and it would seem to be personal, and not assignable'."

Language similar to that used by Mr. Justice REAVIS in *Tipton* v. *Martzell* is to be found in the annotation, "Lease, Right to Assign or Sublet," 23 A. L. R., p. 143. Subdivision (d) deals with leases where a share of the thing produced or percentage of earnings is the *quid pro quo*. Cases from Michigan, Oregon, New York, and other states are cited.

•   •   •   •

Paragraph six is Loggains' promise that during the term of four years the land will be used for the production of rice, and that in accomplishing this end he will use "due diligence and skill."

Appellants rely largely upon *Mitchell* v. *Young,* 80 Ark. 441, 97 S. W. 454, 7 L. R. A., N. S., 221, 117 Am. St. Rep. 89, 10 Ann. Cas. 423. In the opinion in that case it was stated that "where there is no covenant against subletting, a lessee has a right to sublease all or any part of the leased premises; and when he does so, he cannot, by a surrender of the leased premises to the lessor, defeat the right of his undertenant. The interest of the undertenant will continue as if there had been no surrender; the owner of the property becoming the direct landlord of the undertenant. The lessee could only surrender what belonged to him and, having sublet part of the property, it is not his to surrender."

Facts in the case were that Metropolitan Hotel in Little Rock was owned by W. N. Young, who leased to Spencer H. Torrey. February 21, 1902, Torrey sublet barbershop space to W. A. Mitchell. Torrey's term expired November 1st of the year he dealt with Mitchell, but in his contract with Mitchell there was a provision that if he, (Torrey) procured a renewal lease, Mitchell

should continue as subtenant. The primary lease was renewed, and Mitchell was not then disturbed. Torrey died while in possession. Ownership of the hotel became vested in the heirs of W. N. Young. Roger Young (appellee in the suit to dispossess Mitchell) had leased the property. He ascertained that the barbershop space was worth $40 per month instead of the $12 charged Mitchell. But Mitchell had paid for two years after Torrey renewed his lease, and Roger Young's action was not brought until 1905, following Torrey's death in 1904.

We do not think the decision is authority for the proposition that as a matter of law a lease of agricultural land (which does not expressly or by implication authorize substitution of parties) is assignable. While there is testimony that unskilled persons who have not had experience in farming or with cultivation of rice are qualified to assume such duties, or *may* be, the Chancellor was not required to accept these statements with the implications they were intended to convey. In the first place, Mrs. Tolbert was to acquire, through appropriation of rents, a valuable well with pumping equipment; and necessarily they had to be maintained in an efficient manner. Neither of the sublessees was a rice grower. Crump testified that while he was a farmer, he had never lived in a rice country. Murray, he said, had nothing to do with actual operations. Crump had never talked with Mrs. Tolbert about the farming.

We are not cited to any of our own cases holding that as a matter of law such a contract is assignable. Section 6063 of Pope's Digest does not help appellants. It is a part of the Statute of Frauds and mentions what may *not* be done. It does not provide that in reverse circumstances the transactions mentioned are free from other objections.

*Second (b)*.—Alterations in the written contract, and the fact that Mrs. Tolbert's copy did not correspond with changes appearing on the original retained by Loggains, justified the Chancellor in receiving evidence regarding intentions. A reasonable construction of markings on Loggains' copy—that is, the bracketing of paragraph

nine and addition of the provision exempting lessors from paying for water rights—is that when the legal phraseology was read to or by Mrs. Tolbert, an inexperienced person, its meaning was not clear, and she concluded simplified language would best suit the purpose. However, she testified that her understanding of the several transactions was that the net rental from the cultivated land she owned was a fifth, and that she was due five percent of the Burton-Easley-Smith crops as compensation for water used by Loggains. While these computations were for 1944, the Court also found what was payable for 1945—this on the theory that appellants had wrongfully occupied the eighty acres and had without authority utilized water in farming the adjacent areas. These matters are set out in detail in the decree, which is only partially abstracted. An examination of the entire record convinces us that results were not contrary to a preponderance of the testimony.

It is insisted that because Mrs. Tolbert requested Loggains to write on her copy of the lease a statement that the assignment had been made, waiver or acquiescence occurred. We do not think so. At the time this was done the contract with Crump and Murray had been consummated. Mrs. Tolbert, apparently, only sought evidence regarding a matter over which Loggains had no further control.

Appellant calls attention to a mathematical error in computing interest on $3,000 for two years, eleven months, and four days, contending there is an undercharge of $11.70. This objection is tenable; but, since the amount is small we shall assume that appellee will consent in writing that the calculations be amended. If this is not done, appellants may urge the point at any time within fifteen juridical days.

Affirmed on appeal and cross-appeal.