JABER *v.* MILLER.

4-9507                                            239 S. W. 2d 760

Opinion delivered May 21, 1951.

Rehearing denied June 18, 1951.

*Lem C. Bryan* and *Warner & Warner,* for appellant.

*Franklin Wilder* and *Lawrence S. Morgan,* for appellee.

GEORGE ROSE SMITH, J. This is a suit brought by Miller to obtain cancellation of fourteen promissory notes, each in the sum of $175, held by the appellant, Jaber. The plaintiff's theory is that these notes represent monthly rent upon a certain business building in Fort Smith for the period beginning January 1, 1950, and ending March 1, 1951. The building was destroyed by fire on December 3, 1949, and the plaintiff contends that his obligation to pay rent then terminated. The defendant contends that the notes were given not for rent but as deferred payments for the assignment of a lease for-

merly held by Jaber. The chancellor, in an opinion reflecting a careful study of the matter, concluded that the notes were intended to be rental payments and therefore should be canceled.

In 1945 Jaber rented the building from its owner for a five-year term beginning March 1, 1946, and ending March 1, 1951. The lease reserved a monthly rent of $200 and provided that the lease would terminate if the premises were destroyed by fire. Jaber conducted a rug shop in the building until 1949, when he sold his stock of merchandise at public auction and transferred the lease to Norber & Son. Whether this instrument of transfer is an assignment or a sublease is the pivotal issue in this case.

In form the document is an assignment rather than a sublease. It is entitled "Contract and Assignment." After reciting the existence of the five-year lease the instrument provides that Jaber "hereby transfers and assigns" to Norber & Son "the aforesaid lease contract . . . for the remainder of the term of said lease." It also provides that "in consideration of the sale and assignment of said lease contract" Norber & Son have paid Jaber $700 in cash and have executed five promissory notes for $700 each, due serially at specified four-month intervals. Norber & Son agree to pay to the owner of the property the stipulated rental of $200 a month, and Jaber reserves the right to retake possession if Norber & Son fail to pay the rent or the notes. The instrument contains no provision governing the rights of the parties in case the building is destroyed by fire.

Later on the plaintiff, Miller, obtained a transfer of the lease from Norber & Son. Miller, being unable to pay the $700 notes as they came due, arranged with Jaber to divide the payments into monthly installments of $175 each. He and the Norbers accordingly executed the notes now in controversy, which Jaber accepted in substitution for those of the original notes that were still unpaid. When the premises burned Miller contended that Jaber's transfer to Norber & Son had been a sublease rather than an assignment and that the notes therefore represented

rent.   Miller now argues that, under the rule that a sub-lease terminates when the primary lease terminates, his sublease ended when the fire had the effect of terminating the original lease.

In most jurisdictions the question of whether an instrument is an assignment or a sublease is determined by principles applicable to feudal tenures.   In a line of cases beginning in the year 1371 the English courts worked out the rules for distinguishing between an as-signment and a sublease.   See Ferrier, ''Can There be a Sublease for the Entire Term?'', 18 Calif. L. Rev. 1. The doctrine established in England is quite simple: If the instrument purports to transfer the lessee's estate for the entire remainder of the term it is an assignment, regardless of its form or of the parties' intention.   Con-versely, if the instrument purports to transfer the lessee's estate for less than the entire term—even for a day less—it is a sublease, regardless of its form or of the parties' intention.

The arbitrary distinction drawn at common law is manifestly at variance with the usual conception of as-signments and subleases.   We think of an assignment as the outright transfer of all or part of an existing lease, the assignee stepping into the shoes of the assignor:  A sublease, on the other hand, involves the creation of a new tenancy between the sublessor and the sublessee, so that the sublessor is both a tenant and a landlord.   The common law distinction is logical only in the light of feudal property law.

In feudal times every one except the king held land by tenure from some one higher in the hierarchy of feudal ownership.   ''The king himself holds land which is in every sense his own; no one else has any proprietary right in it; but if we leave out of account this royal demesne, then every acre of land is 'held of' the king. The person whom we may call its owner, the person who has the right to use and abuse the land, to cultivate it or leave it uncultivated, to keep all others off it, holds the land of the king either immediately or mediately.   In the simplest case he holds it immediately of the king; only

the king and he have rights in it. But it well may happen that between him and the king there stand other persons; $Z$ holds immediately of $Y$, who holds of $X$, who holds of $V$, who holds . . . of $A$, who holds of the king.'' Pollock and Maitland, History of English Law (2d Ed.), vol. I, p. 232. In feudal law each person owed duties, such as that of military service or the payment of rent, to his overlord. To enforce these duties the overlord had the remedy of distress, being the seizure of chattels found on the land.

It is evident that in feudal theory a person must himself have an estate in the land in order to maintain his place in the structure of ownership. Hence if a tenant transferred his entire term he parted with his interest in the property. The English courts therefore held that the transferee of the entire term held of the original lessor, that such a transferee was bound by the covenants in the original lease, and that he was entitled to enforce whatever duties that lease imposed upon the landlord. The intention of the parties had nothing to do with the matter; the sole question was whether the first lessee retained a reversion that enabled him to hold his place in the chain of ownership.

The injustice of these inflexible rules has often been pointed out. Suppose that $A$ makes a lease to $B$ for a certain rental. $B$ then executes to $C$ what both parties intend to be a sublease as that term is generally understood, but the sublease is for the entire term. If $C$ in good faith pays his rent to $B$, as the contract requires, he does so at his peril. For the courts say that the contract is really an assignment, and therefore $C$'s primary obligation is to $A$ if the latter elects to accept $C$ as his tenant. Consequently $A$ can collect the rent from the subtenant even though the sublessor has already been paid. For a fuller discussion of this possibility of double liability on the part of the subtenant see Darling, ''Is a Sublease for the Residue of a Lessee's Term in Effect an Assignment?'', 16 Amer. L. Rev. 16, 21.

. Not only may the common law rule operate with injustice to the subtenant; it can be equally harsh upon

the sublessor. Again suppose that *A* makes a lease to *B* for a certain rental. *B* then makes to *C* what *B* considers a profitable sublease for twice the original rent. But *B* makes the mistake of attempting to sublet for the entire term instead of retaining a reversion of a day. The instrument is therefore an assignment, and if the original landlord acquires the subtenant's rights there is a merger which prevents *B* from being able to collect the increased rent. That was the situation in *Webb* v. *Russell,* 3 T. R. 393, 100 Eng. Reprint 639. The court felt compelled to recognize the merger, but in doing so Lord Kenyon said: "It seems to me, with all the inclination which we have to support the action (and we have hitherto delayed giving judgment in the hopes of being able to find some ground on which the plaintiff's demand might be sustained), that it cannot be supported. The defence which is made is made of a most unrighteous and unconscious nature; but unfortunately for the plaintiff the mode which she has taken to enforce her demand cannot be supported." Kent, in his Commentaries (14th Ed.), p. 105, refers to this case as reaching an "inequitable result"; Williams and Eastwood, in their work on Real Property, p. 206, call it an "unpleasant result." Yet when the identical question arose in California the court felt bound to hold that the same distasteful merger had taken place. *Smiley* v. *Van Winkle,* 6 Calif. 605.

A decided majority of the American courts have adopted the English doctrine in its entirety. Tiffany, Landlord & Tenant, § 151. A minority of our courts have made timid but praiseworthy attempts to soften the harshness of the common law rule. In several jurisdictions the courts follow the intention of the parties in controversies between the sublessor and the sublessee, thus preserving the inequities of feudal times only when the original landlord is concerned. *Johnson* v. *Moxley,* 216 Ala. 466, 113 S. 656; *Saling* v. *Flesch et al.,* 85 Mont. 106, 277 P. 612; *Mausert* v. *Feigenspan,* 68 N. J. Eq. 671, 63 Atl. 610, 64 A. 801; *Hobbs* v. *Cawley,* 35 N. M. 413, 299 P. 1073.

In other jurisdictions the courts have gone as far as possible to find something that might be said to constitute a reversion in what the parties intended to be a sublease. In some States, notably Massachusetts, it has been held that if the sublessor reserves a right of re-entry for nonpayment of rent this is a sufficient reversionary estate to make the instrument a sublease. *Dunlap* v. *Bullard*, 131 Mass. 161; *Davis* v. *Vidal*, 105 Tex. 444, 151 S. W. 290, 42 L. R. A. (N. S.) 1084. But even these decisions have been criticized on the ground that at common law a right of re-entry was a mere chose in action instead of a reversionary estate. See, for example, Tiffany, *supra,* § 151.

The appellee urges us to follow the Massachusetts rule and to hold that since Jaber reserved rights of re-entry his transfer to Norber & Son was a sublease. We are not in sympathy with this view. It may be true that a right of re-entry for condition broken has now attained the status of an estate in Arkansas. See *Moore* v. *Sharpe,* 91 Ark. 407, 121 S. W. 341, 23 L. R. A., N. S. 937; Core, "Transmissibility of Certain Contingent Future Interests," 5 Ark. L. Rev. 111. Even so, the Massachusetts rule was adopted to carry out the intention of parties who thought they were making a sublease rather than an assignment. Here the instrument is in form an assignment, and it would be an obvious perversion of the rule to apply it as a means of defeating intention.

In Arkansas the distinction between a sublease and an assignment has been considered in only one case, and then in such circumstances that the litigants were in agreement as to the law. In *Pennsylvania Min. Co.* v. *Bailey,* 110 Ark. 287, 161 S. W. 200, the transcript in this court at first contained an instrument purporting to transfer possession for only ten years out of a term of about eighteen years. The appellant accordingly argued that the instrument was a sublease under the orthodox common law rule. The appellee then had the transcript amended to show that the original lessee had later executed an instrument purporting to transfer the entire remaining term. In view of this amendment to the tran-

script the appellee merely adopted the appellant's argument as to the distinction between an assignment and a sublease. It was therefore to be expected that the court would announce the traditional view, since both parties were urging that position. In one other case, *Crump* v. *Tolbert,* 210 Ark. 920, 198 S. W. 2d 518, we adverted by dictum to the customary distinction between the two instruments.

In this state of the law we do not feel compelled to adhere to an unjust rule which was logical only in the days of feudalism. The execution of leases is a very practical matter that occurs a hundred times a day without legal assistance. The layman appreciates the common sense distinction between a sublease and an assignment, but he would not even suspect the existence of the common law distinction. As Darling, *supra,* puts it: "Every one knows that a tenant may in turn let to others, and the latter thereby assumes no obligations to the owner of the property; but who would guess that this could only be done for a time falling short by something—a day or an hour is sufficient—of the whole term? And who, not familiar with the subject of feudal tenures, could give a reason why it is held to be so?" It was of such a situation that Holmes was thinking when he said: "It is revolting to have no better reason for a rule than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." The Path of the Law, 10 Harv. L. Rev. 457, 469. The rule now in question was laid down some years before the reign of Henry IV.

The English distinction between an assignment and a sublease is not a rule of property in the sense that titles or property rights depend upon its continued existence. A lawyer trained in common law technicalities can 'prepare either instrument without fear that it will be construed to be the other. But for the less skilled lawyer or for the layman the common law rule is simply a trap that leads to hardship and injustice by refusing to permit the parties to accomplish the result they seek.

For these reasons we adopt as the rule in this State the principle that the intention of the parties is to govern in determining whether an instrument is an assignment or a sublease. If, for example, a tenant has leased an apartment for a year and is compelled to move to another city, we know of no reason why he should not be able to sublease it for a higher rent without needlessly retaining a reversion for the last day of the term. The duration of the primary term, as compared to the length of the sublease, may in some instances be a factor in arriving at the parties' intention, but we do not think it should be the sole consideration. The *Bailey* case, to the extent that it is contrary to this opinion, is overruled.

In the case at bar it cannot be doubted that the parties intended an assignment and not a sublease. The document is so entitled. All its language is that of an assignment rather than that of a sublease. The consideration is stated to be in payment for the lease and not in satisfaction of a tenant's debt to his landlord. The deferred payments are evidenced by promissory notes, which are not ordinarily given by one making a lease. From the appellee's point of view it is unfortunate that the assignment makes no provision for the contingency of a fire, but the appellant's position is certainly not without equity. Jaber sold his merchandise at public auction, and doubtless at reduced prices, in order to vacate the premises for his assignees. Whether he would have taken the same course had the contract provided for a cancellation of the deferred payments in case of a fire we have no way of knowing. A decision either way works a hardship on the losing party. In this situation we do not feel called upon to supply a provision in the assignment which might have been, but was not, demanded by the assignees.

Reversed.

HOLT, J., not participating