C.R. ANTHONY COMPANY,
Plaintiff/Appellant,

v.

WAL–MART PROPERTIES, INC.,
Defendant/Appellee,

SunWest N.O.P., Inc., Defendant.

SUNWEST N.O.P., Plaintiff,

v.

WAL–MART PROPERTIES, INC.,
Defendant/Appellee,

C.R. Anthony Company,
Defendant/Appellant,

Safeway, formerly known as Safeway Stores, Inc.; Property Development Associates, Defendants.

C.R. ANTHONY COMPANY, Plaintiff,

v.

WAL–MART PROPERTIES, INC.,
Defendant/Appellee,

SunWest N.O.P., Inc., Plaintiff/Appellant.

SUNWEST N.O.P., INC.,
Plaintiff/Appellant,

v.

WAL–MART PROPERTIES, INC.,
Defendant/Appellee,

C.R. Anthony Company, Defendant,

Safeway, formerly known as Safeway Stores, Inc.; Property Development Associates, Defendants/Appellants.

Nos. 94–3029, 94–3030.

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1995.

Decided May 12, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied June 29, 1995.

Edward Wright, Jr., for C.R. Anthony and Victor A. Fleming, Little Rock, AR, argued, for Property Development Associates.

Timothy Howell, Fayetteville, AR, argued, for appellee.

Before WOLLMAN, BEAM, and MURPHY, Circuit Judges.

WOLLMAN, Circuit Judge.

In this diversity case involving a landlord-tenant dispute under Arkansas law, SunWest N.O.P., Inc. (SunWest) and C.R. Anthony Co. (Anthony) appeal from the district court's [1] order granting summary judgment in favor of Wal–Mart Properties, Inc. (Wal–Mart). They also appeal from a subsequent order of the district court granting Wal–Mart's motion for attorney's fees. We affirm.

## I.

On August 7, 1972, Wal–Mart and Safeway Stores, Inc. (Safeway) (predecessor in interest to Safeway, Inc.) executed a shopping center lease agreement (the "lease") concerning property located in Springdale, Arkansas. The original term of the lease was from February 1, 1973, to January 31, 1993. As lessor, Wal–Mart was required under the lease to construct certain improvements to the leased property. The lease provided that its term was not to commence until Safeway, as lessee, accepted possession of the leased premises. Safeway, in turn, was required to accept possession once the required improvements to the property were completed. The lease further provided that "[l]essee, at lessee's option, by giving lessor sixty (60) days' written notice before the expiration of the term or option term then in effect, may extend the term of this lease for four (4) separate and additional periods of five (5) years each on the same terms and conditions."

On September 12, 1972, the parties executed a lease modification agreement. One of the purposes of this agreement was to amend the commencement and termination dates of the lease. The modification agreement provided that the lease was for a term of twenty years, commencing May 1, 1973, and ending April 30, 1993.[2]

Paragraph 2(a) of the lease provided that fixed rental payments would be required in an amount equal to $2.35 per square foot of a 20,693 square foot building to be constructed on the leased property and that the rental payments would be adjusted in the event the actual building size was greater or lesser than initially stated. On July 18, 1974, Wal–Mart and Safeway executed an additional modification agreement in accordance with paragraph 2(a). This agreement provided in part:

WHEREAS, the parties have determined the building size on the leased premises to be 21,131 square feet and desire to modify the minimum monthly rent in accordance with Paragraph 2(a) of said lease.

\* \* \* \* \* \*

FIRST: That commencing on the lease commencement date of July 29, 1973, the minimum monthly rent set forth in Paragraph 2(a) of said lease shall be and is hereby increased by EIGHTY–FIVE AND

---

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

2. A second modification agreement, executed on January 10, 1973, is not at issue in this appeal.

78/100 DOLLARS ($85.78), from FOUR THOUSAND FIFTY–TWO AND 38/100 DOLLARS ($4,052.38) to FOUR THOUSAND ONE HUNDRED THIRTY–EIGHT AND 16/100 DOLLARS ($4,138.16).

On May 3, 1985, Safeway and Anthony entered into a sublease agreement. The term of the sublease was from June 1, 1985, to March 31, 1998. The sublease agreement provided that it was subject to all the terms and conditions (other than rental payments) of the lease. The sublease was also subject to Wal–Mart's written consent, as required under the lease. The sublease further provided that "[Anthony], as sublessee, agrees that in the event the master lease is terminated before the expiration of the term of this sublease, then this sublease and all of the rights and obligations of the parties hereto shall also terminate as of the date of termination of said master lease." Anthony was granted the option to extend the sublease for three consecutive terms. The rental payments under the sublease were substantially more than Safeway was required to pay under the lease, resulting in an income spread to Safeway.

Also on May 3, 1985, Safeway requested approval from Wal–Mart for Anthony as the proposed sub-tenant. On May 17, 1985, Wal–Mart approved Anthony as the sub-tenant and requested a copy of the sublease agreement.

In January 1988, Safeway executed a property management agreement with Property Development Associates. On May 3, 1988, Safeway requested approval from Wal–Mart for an assignment of the lease to SunWest. On August 23, 1988, Safeway and SunWest executed the assignment. As assignee, SunWest agreed to perform and discharge all of the covenants, terms, conditions, and provisions required to be performed by Safeway under the lease. SunWest subsequently granted a lien on its interest as the lessee under the lease to U.S. West Financial Services, Inc. (U.S. West). By letter dated June 7, 1990, Wal–Mart consented to the assignment and also approved the lien to U.S. West. The letter also stated that the lease was scheduled to expire on April 30, 1993,

but that the lessee had options to renew until April 30, 2013.

After filing for bankruptcy sometime in 1991, Anthony began initiating discussions with SunWest concerning renegotiation of the terms of the sublease. In March 1992, Anthony expressed its desire to remain in the Springdale location, and it sought assurance from SunWest that SunWest would agree to maintain the existence of the lease and that it would exercise all renewal options. SunWest responded by stating that it was unable to assure Anthony that the remaining renewal options would be exercised.

In March or April 1993, employees of S.W. Commercial Management and Leasing (S.W. Commercial), a management company providing services to SunWest, reviewed the leases on the Springdale property in order to confirm the expiration date of the lease. In April 1993, Pamela Anselmo, then general counsel for S.W. Commercial, spoke on several occasions with Edward Gross, property manager at Wal–Mart, regarding the lease. Anselmo alleges that she contacted Gross to resolve any confusion caused by the modifications to the lease, which reflected differing commencement dates. According to Anselmo, she and Gross confirmed during their discussions that the records of both SunWest and Wal–Mart referred to differing commencement dates, that one renewal option had already been exercised, and that the termination date for the lease was in the late 1990s, either 1997 or 1998. Gross alleges that Anselmo informed him that there had been a clerical error and that the renewal option had not been exercised. He denies that there was any discussion concerning differing commencement or termination dates.

Subsequent to his discussions with Anselmo, and after consulting with his supervisor, Gross initiated efforts to terminate the lease. By letter dated May 17, 1993, Wal–Mart gave SunWest notice that the lease would be terminated on June 30, 1993. After receiving the termination letter, Anselmo contacted Gross and expressed her belief that the letter directly contradicted their prior understanding. Anselmo alleges that Gross informed her that his prior statements had been incorrect and that the termination letter set forth

Wal–Mart's position. Anselmo further alleges that she then orally exercised the renewal option, but that Wal–Mart would not agree to an extension because it wanted to level the building on the Springdale property and build a parking lot. On May 28, 1993, Gross spoke with Richard Webb of SunWest. Gross alleges that Webb, although not happy that the lease was being terminated, indicated that he would initiate efforts to move from the Springdale property. On June 1, 1993, SunWest gave Anthony notice of its intention to terminate the sublease.

After Anthony received the sublease termination notice, officials with Anthony and SunWest discussed the situation involving the termination of the lease. On June 7, 1993, SunWest wrote to Wal–Mart and indicated that SunWest agreed with Anthony's position that, based on Wal–Mart's approval of the sublease in 1985, SunWest had timely exercised the renewal option. SunWest also indicated in subsequent discussions with Wal–Mart that in view of the reference to July 29, 1973, as the commencement date in the July 18, 1974, modification agreement, it was at least arguable that the twenty-year term of the lease began on July 29, 1973, thereby resulting in a termination date of July 29, 1993. On July 23, 1993, SunWest provided Wal–Mart with written notice of its intention to exercise the renewal option under the lease.

In September 1993, SunWest filed a declaratory judgment action in Arkansas state court against Wal–Mart, Anthony, Safeway, and Property Development Associates, seeking, among other things, a declaration that the renewal option had been timely exercised or that Wal–Mart had waived formal notice of renewal. Shortly thereafter, Anthony filed a declaratory judgment action in federal court against Wal–Mart and SunWest, seeking the same declaratory relief. The state court action was then removed to federal court and the cases were consolidated. On cross-motions for summary judgment, the district court granted Wal–Mart's motion, finding that the lease expired on April 30, 1993, and that SunWest had failed to timely exercise its option of renewal. Wal–Mart filed a subsequent motion with the district

court, requesting, pursuant to the terms of the lease, that SunWest and Anthony be ordered to pay Wal–Mart's attorney's fees. The district court granted the motion, and this appeal followed.

## II.

We review a grant of summary judgment *de novo*, applying the same standards employed by the district court. *Sperry v. Bauermeister, Inc.*, 4 F.3d 596, 597 (8th Cir. 1993); Fed.R.Civ.P. 56(c). We apply the substantive law of Arkansas to this diversity case and review the district court's interpretation of that law *de novo*. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1220–21, 113 L.Ed.2d 190 (1991).

## A.

■ SunWest and Anthony argue that the district court erred in finding that the renewal option had not been timely exercised. SunWest first contends that Wal–Mart was put on notice of the renewal election by the parties' 1985 correspondence regarding the sublease to Anthony, which had a term extending five years beyond the term of the lease, and by Wal–Mart's approval of that agreement.

■ Under Arkansas law, a notice of renewal provision establishes a "condition[ ] precedent to renewal and, where the notice is not given as provided in the instrument and there is no evidence from which waiver might be found, the failure to give notice results in a lapse of the lease." *Gardner v. HKT Realty Corp.*, 23 Ark.App. 148, 744 S.W.2d 735, 737 (1988); *see also Uebe v. Bowman*, 243 Ark. 531, 420 S.W.2d 889, 891 (1967). An unambiguous renewal option will be enforced in accordance with its terms. *See Synergy Gas Corp. v. H.M. Orsburn & Son, Inc.*, 15 Ark.App. 128, 689 S.W.2d 594, 597 (1985).

■ We agree with the district court that the parties' correspondence regarding the sublease and Wal–Mart's subsequent approval of that agreement did not operate as a notice of renewal of the lease by SunWest. An optionee must manifest an intention to exercise the option. *See, e.g., Heyden v. Barnsdall Refining Co.*, 192 Ark. 789, 94

S.W.2d 709 (1936). Nowhere in the correspondence sent to Wal–Mart—some eight years prior to expiration of the lease—did SunWest manifest any intention to accept the option of renewal. The most telling factor reflecting the lack of any such intention is SunWest's conduct following the execution of the sublease. In March 1992, SunWest specifically refused to provide Anthony with any assurance that options for renewal would be exercised. If SunWest had already exercised the renewal option, the question arises as to why it did not disclose that fact to Anthony— a fact that SunWest now asserts had existed for nearly seven years? The answer is that the renewal option had not been exercised. Indeed, it was only after Wal–Mart served SunWest with notice of termination of the lease that SunWest adopted Anthony's position and attempted to argue that the sublease correspondence served as a notice of renewal. We reject this after-the-fact attempt to convert the sublease transaction into something that obviously was not contemplated by SunWest at the time. *Cf. Fidelity & Columbia Trust Co. v. Levin,* 128 Misc. 838, 843, 221 N.Y.S. 269, 274 (approval of sublease extending beyond term of original lease did not operate as an election to renew), *aff'd,* 221 A.D. 786, 223 N.Y.S. 866 (1927), *aff'd,* 248 N.Y. 551, 162 N.E. 521 (1928).

■ SunWest further argues that the district court erred in concluding that the termination date of the lease was April 30, 1993. It asserts that the July 18, 1974, modification agreement changed the commencement date of the lease to July 29, 1973, thereby adjusting the termination date to July 29, 1993. Thus, according to SunWest, the oral notice of renewal given in May 1993 was timely.

■ The language of the July 18, 1974, modification agreement, however, suggests that it was intended to modify only the minimum monthly rental. It does not purport to alter the commencement date or the termination date. At best, the reference to July 29, 1973, as the commencement date creates an ambiguity in the lease. In resolving that ambiguity, we may look to the construction that the parties have placed on the contract. *Synergy Gas Corp.,* 689 S.W.2d at 597; *Beas-*

*ley v. Boren,* 210 Ark. 608, 197 S.W.2d 287, 289 (1946).

The record reflects that the parties operated under the assumption that the termination date of the lease was April 30, 1993. All of the correspondence sent by Wal–Mart to SunWest in which a termination date is mentioned refers to April 30, 1993, as do SunWest's own internal records. It was only after the time for acceptance of the renewal option had passed that any contrary allegation was made by SunWest or Anthony. Moreover, even if the July 18, 1974, modification agreement had the effect of changing the commencement date, the termination date would not have been affected, for the lease specifically provided that if the lessee accepted possession of the leased premises on a date other than the originally stated commencement date, the expiration date would remain unchanged. Accordingly, we conclude that the July 18, 1974, modification agreement had no effect on the April 30, 1993, termination date.

### B.

■ SunWest argues that Wal–Mart waived any requirement of formal notice of renewal. It contends that a waiver occurred when Gross agreed with Anselmo during their discussions in May 1993 that the lease terminated sometime in the late 1990s, either 1997 or 1998. We disagree.

In *Riverside Land Co. v. Big Rock Stone & Material Co.,* 183 Ark. 1061, 40 S.W.2d 423, 425 (1931), the Arkansas Supreme Court noted that a waiver of notice of renewal will be found "where the facts warrant it." There, the court held that the lessor had waived any notice requirement by accepting rent, without objection, for more than a year before the lessee gave notice of its intention to renew the lease. *Id.* 40 S.W.2d at 426. Here, there are no such circumstances. On May 17, 1993, shortly after the April 30, 1993, termination date, Wal–Mart gave SunWest notice of its intention to terminate the lease. Accepting, as we must, Anselmo's version of her discussions with Gross, we are unable to conclude that there has been a waiver. Those discussions did not occur until

well after the date had passed for timely notice of renewal, and even then SunWest did not give the requisite written notice until July 23, 1993, some two months after it had received Wal–Mart's termination letter.

SunWest also claims that Wal–Mart's approval of the sublease constitutes a waiver. According to SunWest, in view of the fact that the term of the sublease extended beyond that of the lease, Wal–Mart should have known that SunWest had exercised its renewal option. In support of this argument, SunWest cites *Southern Ry. Co. v. Peple*, 228 F. 853 (4th Cir.1915). In *Peple*, the original lease gave the lessee an option to renew by giving ninety days' written notice. As in this case, the lessee subleased the property for a term extending beyond the term of the original lease and assigned its rights in the lease to another party. Although the assignee's notice of renewal was untimely, the lessor did not respond to the notice for five weeks. When the lessor did respond, it promised the assignee that the lease would be renewed if it wrote a letter on the matter to the lessor's vice president and general manager. On those facts, the court held that the lessor had waived the requirement of timely notice. *Id.* at 859.

We find this case to be distinguishable from *Peple*. Wal–Mart did not engage in a significant delay in responding to SunWest's written notice of renewal. Indeed, unlike in *Peple*, SunWest's written election to renew was not sent until well after it had received Wal–Mart's termination letter. Moreover, there is no evidence that Wal–Mart promised to renew the lease. The only significant similarity here to *Peple* is the fact that Wal–Mart approved a sublease that extended beyond the term of the lease. As the court in *Peple* noted, 228 F. at 856, this fact is insufficient to support a finding of waiver. Even if Wal–Mart should have known that SunWest was considering an acceptance of the renewal option, SunWest would still have had to manifest such an intention when it requested approval of the sublease. As we have already noted, no such intention was exhibited. Finally, the lease gave Wal–Mart no power to object to the term of the sublease. We decline to find a waiver based on Wal–Mart's failure to raise an objection that it had no authority to assert. Accordingly, we hold that the facts of this case do not warrant a finding of waiver and that the district court did not err in concluding that SunWest's renewal notice was untimely.

### C.

Assuming that the renewal notice was untimely, SunWest and Anthony maintain that SunWest should nonetheless be equitably relieved from its failure to comply with the renewal provision of the lease. In support of this contention, they argue: (1) that it would cost SunWest more than $180,000 to release the lien on its leasehold interest; (2) that SunWest would lose more than $600,000 in spread income on the sublease; and (3) that Anthony has expended approximately $72,000 for fixtures and leasehold improvements to the Springdale property.

"[T]here are circumstances where equity may grant relief from a delay or failure to give notice of the option to renew a lease." *Gardner*, 744 S.W.2d at 737. Equitable relief may be granted where fraud, accident, surprise, or mistake have caused the delay or where there are other special circumstances warranting the relief. *Id.* "Under this rule, relief is warranted where on the one hand it is shown that the lessor has not changed his position or otherwise been prejudiced by the delay, and on the other that the enforcement of the covenant will result in undue and inequitable hardship to the tenant." *Id.* No single factor is dispositive; the determination depends on a balancing of the equities between the parties. *Id.* at 738.

Accepting for purposes of argument Sun-West's assertion that the delay in exercising the renewal option was due to a mistake, the question is whether Wal–Mart has been prejudiced by the delay and whether a denial of equitable relief will result in an undue and inequitable hardship to SunWest and Anthony. The only Arkansas case discussing the principle of equitable relief is *Gardner*. There, the court granted equitable relief to the lessee. The factors supporting that court's decision included: (1) the tenant was required under the lease to make costly improvements; (2) the tenant had faithfully

performed its obligations under the lease for over twenty years; (3) there was no evidence that the lessor had changed its position in reliance on the tenant's failure to give notice or that it would be harmed if the lease was to continue; (4) there was no evidence that the tenant never intended for the lease to lapse and had invested large sums in obtaining architectural plans for improvements to the property and that the lessor was aware of these plans; (5) the lessor had breached the lease, forcing the tenant to initiate litigation; (6) there was no evidence that the tenant was grossly negligent in failing to give notice, but rather that it had withheld notice in the good-faith belief that renewal of the lease during settlement negotiations with the lessor would prejudice its rights; and (7) evidence of less than good faith on the part of the lessor. 744 S.W.2d at 738.

Applying the test set forth in *Gardner* to the facts of this case, we conclude that the balance of equities between the parties does not sufficiently weigh in favor of SunWest or Anthony so as to entitle them to equitable relief. SunWest was not required to make any improvements to the Springdale property, and there is no evidence that Wal–Mart was aware of any improvements that Sun-West or Anthony may have made. A portion of SunWest's estimated loss is actually a reduction of its own debt. The only potential out-of-pocket loss advanced by SunWest is its assertion that it will lose more than $600,000 in spread income on the sublease to Anthony. SunWest cites no authority for the proposition that a loss of estimated profits from a sublease can be considered as an undue hardship. The only court that we have found to have considered such an argument has rejected it. *See Lemay v. Rouse,* 122 N.H. 349, 444 A.2d 553, 556 (1982) (per curiam) (lost profits to lessees from sublease "can hardly be found an unconscionable hardship"). Moreover, it cannot be assumed that Sun-West will actually incur such a loss, for it at no time assured Anthony that future renewal options would be exercised.

As to Anthony, it too was not required to make improvements to the leased property. Nevertheless, Anthony alleges that it did expend approximately $72,000 for fixtures and leasehold improvements to the property and that it will sustain a loss of those improvements, as well as incur additional expenses for moving to another site. We suspect, however, that such losses could be alleged by any lessee who has failed to properly exercise a lease option. In any event, the lease provides at least a partial remedy to Anthony by allowing the lessee to remove any fixtures and equipment that have been installed on the premises.

Conversely, Wal–Mart argues that it will be prejudiced if the lease is allowed to continue because it intends to construct additional parking area on the property. Although Wal–Mart's estimate of loss is even less compelling than that of SunWest or Anthony, we simply cannot say that this case presents the "peculiar and special circumstances" found in *Gardner* involving "an unconscionable hardship to a tenant with no corresponding harm to the landlord." *Gardner,* 744 S.W.2d at 738. Accordingly, we hold that the district court did not err in refusing to grant equitable relief.

### III.

■ Finally, SunWest and Anthony argue that the district court erred in granting Wal–Mart's subsequent motion for attorney's fees. They assert that there is no authority, except by statute, under Arkansas law for such an award. The lease in this case, however, specifically provides that in a lawsuit between the lessor and lessee, "the unsuccessful party shall pay to the prevailing party a reasonable sum for attorney's fees." In Arkansas, "an agreement [for the payment of attorney's fees] is enforceable in accordance with its terms[.]" *Griffin v. First Nat'l Bank of Crossett,* 318 Ark. 848, 888 S.W.2d 306, 311 (1994). Any attorney's fees awarded must be reasonable. *Id.* 888 S.W.2d at 311.

As assignee of the lease, SunWest is in privity of estate with Wal–Mart and would normally only be liable for covenants in the lease that run with the land. *Keith v. McGregor,* 163 Ark. 203, 259 S.W. 725, 727 (1924). SunWest, however, expressly agreed to perform and discharge all of the covenants, terms, conditions, and provisions required to be performed by Safeway under

the lease. By doing so, it became in privity of contract with, and therefore contractually obligated to, Wal–Mart. *See* 49 Am.Jur.2d *Landlord and Tenant* §§ 1132–1135 (1995). "A lessee's assignee, who assume[s] the lease, is bound to perform a covenant in the lease by which the lessee agree[s] to pay the lessor[ ] a reasonable attorney's fee in the event an action [i]s filed to compel the performance of the terms and conditions of the lease or to terminate it." *Id.* § 1137, at 889. Consequently, SunWest is bound by the provision in the lease regarding the payment of attorney's fees. *See id.* It does not challenge the district court's finding that the fees requested were reasonable. Accordingly, we affirm the district court's enforcement of the attorney's fees provision against SunWest.

 Anthony argues that it is only a sublessee and that it is not obligated to Wal–Mart under the lease. It is true that ordinarily there is no privity of estate or privity of contract between a sublessee and the original lessor. *See Gagne v. Hartmeier*, 271 Ark. 845, 611 S.W.2d 194, 196 (1981). The general rule is that the lessor "has no direct action against the sublessee on the covenants in the lease." *Id.* (quotation omitted); *see also Jaber v. Miller*, 219 Ark. 59, 239 S.W.2d 760, 763 (1951). There is, however, an exception to this rule. "[W]here the sublessee has agreed with the lessee to assume the obligations of the parent lease, the lessor has a right of action as a 'creditor beneficiary' against the sublessee for a breach thereof even though he is not a party to the contract of assumption." 51C C.J.S. *Landlord and Tenant* § 48(1), at 144–45 (1968); *see also Foucar v. Holberg*, 85 Ark. 59, 107 S.W. 172, 173 (1908) (agreement by tenant to pay rent made him liable to lessor regardless of whether tenant was sublessee or assignee); *Amco Trust, Inc. v. Naylor*, 159 Tex. 146, 317 S.W.2d 47, 50 (1958) (no privity between lessor and sublessee unless sublessee binds itself to perform the covenants in the lease). Although Anthony is a sublessee and ordinarily would not be liable to Wal–Mart, it specifically agreed to be bound by the terms and provisions of the lease. Like SunWest, Anthony does not challenge the finding of the district court that the fees requested were reasonable. Therefore, we conclude that the

district court did not err in also enforcing the attorney's fees provision against Anthony.

The judgments are affirmed.