522 So.2d 725 (1987)
Charles L. WEEKS & Walter Roman
v.
CAL-MAINE FOODS, INC.
No. 57157.
Supreme Court of Mississippi.
December 16, 1987.
Rehearing Denied April 20, 1988.
William R. Armstrong, Jr., Henderson, Duke, Dantone & Hines, Greenville, for appellants.
William H. Gault, Jr., Wells, Moore, Simmons, Stubblefield & Neeld Jackson, for appellee.
Before HAWKINS, P.J., and ANDERSON and GRIFFIN, JJ.
HAWKINS, Presiding Justice, for the Court:
Charles L. Weeks, the assignee of a lease between Chicken Chef Systems, Inc. (Chicken Chef), and the owner Walter Roman, appeals from a directed verdict in favor of Cal-Maine Foods, Inc. (Cal-Maine) (the successor corporation to Chicken Chef), rendered in the circuit court of Washington County.
Following a suit by Roman against Cal-Maine for nonpayment of rent, Cal-Maine (without contacting Weeks) paid Roman and settled the case. Cal-Maine then instituted this action against Weeks.
*726 Because it appears Weeks and Cal-Maine had, prior to any dispute between Roman and Cal-Maine, been released by Roman from most of the lease obligations, we affirm in part and reverse and remand in part.

FACTS
On July 29, 1969, Chicken Chef, a Mississippi corporation, entered into a written lease agreement with Roman, owner of a restaurant building. The lease agreement was for a period of 15 years at a monthly rental of $571.13, with an option to extend the term two additional five-year periods; Chicken Chef also agreed to pay city and county ad valorem taxes as they became due. Chicken Chef subsequently vacated the building, but continued rent payments. In 1970 there was a corporate merger of Chicken Chef into Cal-Maine.
Weeks noticed the vacant building and wanted it for a restaurant. Thereafter, on March 27, 1970, eight months after the original lease, Chicken Chef entered into an assignment with Weeks, which was called a "sublease" by the parties, and which was consented to in writing by Roman. In the sublease Weeks rented the property for the remainder of the lease term, agreeing to fulfill all obligations of Chicken Chef in the prior lease, and thereby receiving all Chicken Chef's rights, including the option to renew the lease. Chicken Chef agreed that it would remain primarily liable under the lease. After the sublease was executed, Weeks entered the building and made payment of rentals directly to Roman. Weeks also paid city and county taxes directly to the city and county. Weeks maintained insurance on the premises as required by the lease through April 28, 1977. When Weeks occasionally would miss one of the payments, Roman would call Mr. or Mrs. Weeks to bring the rent current.
Weeks decided to close his restaurant effective January 1, 1976, and contacted Roman for permission. He did not contact Chicken Chef, thinking he was not required to do so in the lease. (All Weeks' dealings for almost six years had been with Roman.) Weeks then subleased the building to several other parties who occupied the building for short periods of time. Weeks contacted Roman before subleasing and continued to make the rental payments and pay the taxes. Weeks would sometimes fall behind in his rental payments, and Roman would, as noted, call him to get his payments current. Weeks testified that he continued to make the rental payments to Roman through August of 1977 and to pay the taxes through half of 1977.
In August of 1977 when the building was vacant, Weeks again tried to find sub-lessees. Weeks then made an attempt to rezone the property, but failed. Then early in 1978, almost eight years after the execution of the "sublease," Roman approached Weeks and asked him not to do anything with the property because he wanted to sell it. Roman told Weeks that Roy Fulton (Fulton) was interested in leasing the property and possibly buying it. Weeks gave Roman the key to the building. A few days later Weeks called to meet Fulton and Roman at the building. There, Weeks was asked by either Roman or Fulton to remove his equipment. At this same time, Weeks was asked to have the heating and air conditioning system repaired. Weeks did hire and pay the repairman. Roman testified that:
[I]n the spring of '78 [Fulton] came to me and wanted to lease the building. I contacted Mr. Weeks and got the key and showed him the building and leased him the building for five or six months.
The rent Fulton paid was $600 per month, which he paid directly to Roman. Around January of 1978 when the taxes for 1977 were due, Roman told Weeks that if Weeks would pay half the taxes for the year, Roman would pick it up from then on. Roman testified that after 1977 when he stopped receiving payments, he did not contact Weeks and request any further payments. After that time Weeks was never told by Roman, Chicken Chef, or Cal-Maine that he should resume occupancy and payment of the rent. Roman never contacted Weeks because:
I never thought Mr. Weeks was the man that I had my lease with. I know Mr. *727 Weeks was paying me my rent and that was a unique situation with me, but I felt like Chicken Chef were the people that owed me and that is who I was trying to contact trying to do something about it.
Weeks was contacted by several persons after that time who wanted to rent or occupy the building. Weeks would always have them call Roman. After Fulton had vacated the building, Roman allowed a civic organization that sold Christmas trees and "some pottery outfit" to occupy the building at no charge. Weeks, because of Roman's statements and actions, considered that Roman had released him.
On February 20, 1979, around one year after Roman had requested Weeks vacate the building, the attorney for Roman sent Cal-Maine a letter demanding past due rent under the lease. Cal-Maine's letter eventually reached the attorney for and secretary of Cal-Maine. Correspondence passed between the attorneys including a statement prepared by Roman of the past due amounts. In June, 1979, Roman filed suit against Cal-Maine in the Washington County circuit court for the past due rent. Cal-Maine made only a cursory review of the matter and eventually settled the lawsuit thereby terminating the lease between Cal-Maine and Roman on the 29th of July, 1979, for $27,500. Cal-Maine then filed the present action on December 14, 1979, against Weeks and Roman (who was dismissed just before trial) in the circuit court of Washington County for breach of the sublease agreement.
Following trial the circuit judge granted a peremptory instruction in favor of Cal-Maine, because it was not proven that Roman was an agent of Cal-Maine, or that if he were an agent it was for the very limited purpose of collecting the rents. Therefore, Roman could not release Weeks from his assignment.
Weeks has appealed.

LAW

EFFECT OF ROMAN'S RELEASE OF WEEKS
As above noted, Cal-Maine imprudently settled the lease dispute with Roman without contacting Weeks.
The question, therefore, is what obligation Cal-Maine had to Roman under the lease following Roman's agreement with Weeks to release him. If Roman had released Weeks, the assignee, from the lease, then Cal-Maine was released and had no further contractual obligation. Also, under these facts, in its subsequent suit against Weeks, Cal-Maine could have no greater right against him for breach of the lease than Roman would have in the same suit. The fact that Cal-Maine may have paid Roman money it did not owe gave Cal-Maine no right to recovery from Weeks.
The agreement entered into by the parties on March 27, 1970, was called a sublease but was in actuality an assignment. "[I]f the lessee parts with his entire interest in the term, it constitutes and assignment, not a subletting, although the transfer is in form a sublease." Johnson v. Moxley, 216 Ala. 466, 467, 113 So. 656, 657 (1927). In the agreement between Weeks, Chicken Chef and Roman, Weeks expressly:
[A]ccepts and agrees to discharge all terms, conditions and obligations of lessee as set forth in the lease aforesaid, which is attached as Exhibit "1" hereto and agrees to discharge all terms and conditions of said lease as if he had been the original lessee therein.
Since under the "sublease" agreement Chicken Chef transferred its entire interest in the lease, while agreeing to remain primarily liable, it constituted an assignment.
This Court has recently stated:
On numerous occasions this Court has said that in assignments of contracts between parties an assignee obtains no greater right in the thing assigned than was possessed by the assignor, but simply stands in the shoes of the latter and assignee's rights can rise no higher than assignor's. See, Indiana Lumbermen's Mutual Insurance Co. v. Curtis Mathes Mfg. Co., 456 So.2d 750 (Miss. 1984); Smith v. Copiah County, 232 Miss. 838, 100 So.2d 614 (Miss. 1958); Simmons v. *728 Smith County Bank, 225 Miss. 384, 83 So.2d 441 (Miss. 1955); and Canton Exchange Bank v. Yazoo County, 144 Miss. 579, 109 So. 1 (Miss. 1926).
The logical inversion of this rule dictates that the assignee must acquire all those rights, interests and remedies available to assignor, and in the case sub judice this apparently includes those the lessor incorporated in the original lease, one of which granted the lessee and subsequent assignees right to timely make a request for reconstruction of the building in the event of fire, casualty or other act of God. [Emphasis added]
Ford v. White, 495 So.2d 494, 497 (Miss. 1986).
Because Weeks "stood in the shoes" of both himself and Cal-Maine, a surrender of the leased premises by himself to Roman, and an acceptance by Roman, would release not only Weeks, but Cal-Maine as well from the lease obligations.
In Cauble v. Hanson, 224 S.W. 922, 925 (Tex.Civ.App. 1920), the Texas Court of Appeals held:
[T]he liability of the original lessees ... is regarded as being in the nature of a surety for their assignee ... therefore any credit to which the assignee is entitled would inure to the benefit of the original lessees.
Roman's acceptance of the surrender by Weeks relieved both Chicken Chef and Weeks of future rent. "The relinquishment of possession by the tenant and the resumption of possession by the landlord operates as a general rule as a surrender by operation of law." 49 Am.Jur.2d Landlord and Tenant, § 1100.
This Court in Stein v. Hyman Lewis Co., 95 Miss. 293, 299, 48 So. 225, 226 (1909), stated: "An absolute and unqualified taking of possession shows acceptance unless the landlord indicates to the tenant his purpose to hold him liable for the rent." Another jurisdiction has stated that the acceptance of the keys alone does not manifest an intent on the part of the lessor to cancel the lease. See Ryals v. Laney, 338 So.2d 413 (Ala. Civ. App. 1976). Roman, however, admitted that he gave no notice to Cal-Maine or Weeks that he was intending to hold either one of them liable for future rent. It is clear from this record that in January, 1978, Roman did in fact take unqualified possession of the leased premises, with no expressed intention to receive further rental payments from Weeks. That Roman released Weeks is further demonstrated by his telling Weeks in January that if Weeks would pay one-half the ad valorem taxes for 1977, that he (Roman) would pay them thereafter.
We therefore conclude that Roman released Weeks from all further rental payments due under the lease subsequent to January, 1978. It follows that in so doing, Cal-Maine was likewise released.
The question remains, however, as to whether Weeks was released from monthly rental payments which had accrued prior to January, 1978. Weeks contends that he was current on all payments through August, but that even if he were not, Roman's re-taking possession relieved him. We disagree. Weeks could only be released by operation of law from future rent payments, not accrued obligations. See generally: Olsen v. Country Club Sports, Inc., 110 Idaho 789, 718 P.2d 1227 (1985); Frisco Joes Inc. v. Peay, 558 P.2d 1327 (Utah 1977); Kanter v. Safran, 68 So.2d 553 (Fla. 1953); Boyd v. Gore, 143 Wis. 531, 128 N.W. 68 (1910). Because the record is conflicting as to whether there was any unpaid rent due in August, 1977, (Weeks admits he paid no rent between August, 1977, and January, 1978) we remand for a determination of this factual issue. To this limited extent, Cal-Maine is entitled to recover from Weeks. With the exception of the months admittedly unpaid, the learned circuit judge erred in granting the peremptory instruction for Cal-Maine.

PROOF OF MERGER
In 1970, after the "sublease" agreement, Chicken Chef merged into Cal-Maine. The only evidence of the merger presented at trial was the testimony of Bobby Raines, the vice president-treasurer and assistant secretary of Cal-Maine. *729 Weeks contends that this merger was not proven by competent and admissible evidence because under Miss. Code Ann. § 79-3-151 (1972) a corporate merger is effective upon issuance of a certificate of merger or certificate of consolidation by the Secretary of State; therefore, the certificate of merger was the only evidence that could be used to prove the merger absent explanation of the certificates' unavailability.
Both Weeks and Cal-Maine contend that Tisdale v. Jefferson Standard Life Ins. Co., 244 Miss. 839, 147 So.2d 122 (1962), applies to the facts of this case. The Court in Tisdale, which was concerned with the age of the appellant, pointed out that:
[W]hen the very nearly exact age of a person is the issue, the best proof of the fact must be produced if practically possible to do so and that such proof is the testimony of those who were present and distinctly remember the birth or if not present were so situated as to have positive knowledge and remembrance of the date ... [Emphasis added]
244 Miss. at 847, 147 So.2d at 125.
Therefore, Raines could testify if the alleged merger of Cal-Maine and Chicken Chef were not the issue, or if he were present and distinctly remembered the merger, or if he were so situated to have positive knowledge and remembrance of the merger. In International Looms, Inc. v. Jono Textile Co., 34 Conn.Sup. 599, 602, 379 A.2d 3, 5 (1977), the Connecticut Court stated:
The trial court assumed that documentary evidence was essential to show the assignment of Newton's claim to the plaintiff. Such documentary evidence, however, is not required. There was testimony from the president of the plaintiff corporation that the plaintiff, a New York corporation, and Newton had merged. Since merger was a collateral issue documentary evidence of that fact was not necessary.
Furthermore, this Court has previously allowed even lower ranking persons of the corporation to testify as to corporate existence. See Sanders v. State, 219 So.2d 913 (Miss. 1969) (manager); Osby v. State, 229 Miss. 660, 91 So.2d 748 (1957) (cashier). Therefore, although it may have been preferable to have introduced the certificate of merger, the testimony of Raines was sufficient to prove existence of the merger.

PRE-JUDGEMENT INTEREST
Weeks has also argued, based on Commercial Union Ins. Co. v. Byrne, 248 So.2d 777 (Miss. 1971), that pre-judgment interest should not be added. In Bryne, supra, there was a justifiable dispute as to the damage to the plaintiff's home caused by a hurricane. Justice Inzer, speaking for the Court, stated that the amount was too uncertain for interest to be added, and that the adding of interest is in the discretion of the trial court. Justice Inzer went on to say the plaintiff "is entitled to interest from the time the payment is due, provided a proper demand for interest is made." Byrne, supra, at 783. Accord,: Collins v. Carter, 155 Miss. 600, 125 So. 89 (1929). Cal-Maine made a proper demand for interest in its complaint. Therefore, pre-judgment interest would be due on any unpaid monthly rentals prior to January, 1978.
We, therefore, reverse and render judgment here for Weeks as to any and all obligations under the lease contract becoming due subsequent to January, 1978. As to any rent due and payable in January, 1978, we reverse and remand for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
DAN M. LEE, P.J., specially concurs.
DAN M. LEE, Presiding Justice, specially concurring:
The majority opinion today overlooks an important fact when it finds that Weeks is an assignee, and not a sublessee, of Chicken Chef/Cal-Maine (herein "Cal-Maine"). *730 That important fact is that Weeks and Cal-Maine entered into a sublease agreement in which Weeks expressly agrees to be Cal-Maine's sublessee, not its assignee. Furthermore, Roman expressly consents to Cal-Maine subletting to Weeks so long as Cal-Maine remains liable to Roman as his lessee. Cal-Maine agrees to remain liable to Roman as his lessee. The provisions of the sublease specifically state these intentions of the parties:
By the execution hereof, Walter Roman specifically consents to the subletting of the above-described property and affirmatively accepts said Charles Weeks as sublessee. However, anything herein to the contrary notwithstanding, the Chicken Chef Systems, Inc. [Cal-Maine] shall remain primarily liable as lessee to Walter Roman.
It was the further intent of the parties that the lease and sublease be two separate agreements. The sublease creates a new set of rights and obligations flowing only between Weeks and Cal-Maine, namely that Weeks could occupy the building, leased to Cal-Maine, in return for paying rent to Cal-Maine. The original lease between Cal-Maine and Roman remained in force with a separate set of rights and obligations flowing between Roman and Cal-Maine. Indeed, Roman held Cal-Maine liable for the arrearage in rent in reliance on the original lease. Cal-Maine paid the arrearage to avoid litigation upon its liability  again in reliance upon its original lease with Roman and sublease to Weeks.
Where all three parties expressly agreed that the original lease between Cal-Maine and Roman would remain in force and where Roman and Cal-Maine relied upon such agreement, this Court should not be at liberty to construe the sublease as an assignment. See e.g., Coles Trading Company v. Spiegel, Inc., 187 F.2d 984 (9th Cir.1951); Mausert v. Christian Feigenspan, 68 N.J. Eq. 671, 64 A. 801 (N.J. Eq. 1905); Saling v. Flesch, 85 Mont. 106, 277 P. 612 (1929); Hobbs v. Cawley, 35 N.M. 413, 299 P. 1073 (1931); Jaber v. Miller, 219 Ark. 59, 239 S.W.2d 760 (1951). Furthermore, to construe the sublease as an assignment eradicates the privity of contract between Cal-Maine and Weeks, a relationship which all three parties expressly agreed to. The overriding consideration for this Court must be that all three parties intended and expressly agreed that Weeks be a sublessee of Cal-Maine.
A sublease creates the relationship of landlord and tenant between the lessee and the sublessee, such that the sublessee is liable to the lessee on the covenants in the sublease. See e.g., Magnolia Petroleum Company v. Carter, 2 So.2d 680 (La. App. 1941); Jaber v. Miller, 219 Ark. 59, 239 S.W.2d 760 (1951); Anderson v. Ries, 222 Minn. 408, 24 N.W.2d 717 (1946). As Cal-Maine's sublessee, Weeks is in privity of contract with Cal-Maine, not with Roman. Goldberg v. L.H. Realty Corp., 227 Miss. 345, 86 So.2d 326 (1956). Weeks did pay the rent to Roman, but merely as a matter of convenience to Cal-Maine and Roman. When Weeks failed to pay the rent, he breached his contract with Cal-Maine, not with Roman. Roman, on the other hand, was in privity of contract with Cal-Maine. Once Weeks vacated the premises and discontinued payment, Roman looked to Cal-Maine for the past-due rent, as well as for rent during the remainder of the lease term. Goldberg, 227 Miss. at 350, 86 So.2d at 328. See also, Rourke v. Bozarth, 103 Okl. 133, 229 P. 495 (1924); Barkhaus v. Producers Fruit Company, 192 Cal. 200, 219 P. 435 (1923); Carson v. Imperial `400' National, Inc., 267 N.C. 229, 147 S.E.2d 898 (1966); Dixie Fire and Casualty Company v. Esso Standard Oil Company, 265 N.C. 121, 143 S.E.2d 279 (1965); Sinberg v. Davis, 285 Pa. 426, 132 A. 287 (1926). Cal-Maine then had a right to look to Weeks to pay the rent it owed Roman pursuant to their sublease agreement.
The majority is partially correct in the result it reaches today. There is a factual dispute as to whether there was unpaid rent due Roman on August of 1977. I submit, however, that there is a factual dispute as to when Roman put his lessee, Roy Fulton, into the building. The majority finds that Roman took possession of the building subsequent to January 1978. The record reflects, however, that Weeks may *731 have turned over possession of the building to Roman sometime in 1977. Roman apparently contends that he did not take possession of the building in order for Fulton to become his lessee until January of 1978. The resolution of this dispute is a key element in determining the extent of Cal-Maine's liability to Roman for unpaid rent. Roman cannot hold Cal-Maine liable for rent after he placed Fulton in possession of the building and began collecting rent from him. His actions in leasing the building to Fulton released Cal-Maine from its obligations under the lease.
These factual questions, the amount of unpaid rent prior to August of 1977, and the date Roman took possession of the building for his lessee, Fulton, must be determined by the trier of fact and the trial court erred in granting a directed verdict for Cal-Maine. Therefore, I would reverse and remand for trial on both issues. To the extent that Roman was owed rent up to the point when Roman leased to Fulton, Cal-Maine is entitled to recover from Weeks.