# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-00778-SCT

*DONNA D. ZUMWALT AND ZUMWALT, INC.*
*d/b/a JONES COUNTY REST HOME*

*v.*

*JONES COUNTY BOARD OF SUPERVISORS,*
*SOUTH CENTRAL REGIONAL MEDICAL*
*CENTER d/b/a COMFORT CARE NURSING*
*CENTER AND MISSISSIPPI STATE*
*DEPARTMENT OF HEALTH*


| | |
|---|---|
| DATE OF JUDGMENT: | 04/16/2008 |
| TRIAL JUDGE: | HON. PATRICIA D. WISE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | THOMAS L. KIRKLAND, JR. |
| | JULIE B. MITCHELL |
| | ANDY LOWRY |
| ATTORNEYS FOR APPELLEES: | JAMES W. CRAIG |
| | FRED L. BANKS, JR. |
| | R. GREGG MAYER |
| | JEFFREY S. MOORE |
| | DONALD E. EICHER, III |
| | BEA M. TOLSDORF |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 09/10/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE WALLER, C.J., DICKINSON AND KITCHENS, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     This appeal arises from a decision of the Hinds County Chancery Court regarding

which party "owns" a "historical certificate of need" as well as the right to operate the

facility known as the Jones County Rest Home, and whether Zumwalt "owns" the nursing home license for the Jones County Rest Home. We affirm the chancery court's denial of Zumwalt's claims of ownership interests in the certificate of need, the license, and the facility.

### APPLICABLE STATUTES, RULES, AND REGULATIONS

¶2.     This Court is asked to address the Certificate of Need Laws of 1979; whether those laws confer ownership and/or operational rights for a facility within their scope of coverage; what, if any, ownership interest is conferred upon a nursing home licensee; and the "ownership" of the Jones County Rest Home. For the sake of clarity, we first set out some of the applicable statutes and agency regulations necessary to the analysis of this case.

¶3.     By statute, nursing homes are required to be licensed before they are permitted to operate. Miss. Code Ann. §43-11-5 (Rev. 2004). The purpose of licensing nursing homes is set out by statute:

> The purpose of this chapter is to protect and promote the public welfare by providing for the development, establishment and enforcement of certain standards in the maintenance and operation of institutions for the aged or infirm which will insure safe, sanitary and reasonably adequate care of individuals in such institutions.

Miss. Code Ann. § 43-11-3 (Rev. 2004). Once issued, licenses are subject to suspension or revocation should conditions warrant and if the licensee is not fulfilling its obligations. Miss. Code Ann. § 43-11-11 (Rev. 2004). Renewal of licenses is not automatic. Approval by the licensing agency is still required. Miss. Code Ann. § 43-11-9(1) (Rev. 2004).

¶4.     Since the Mississippi Department of Health is entrusted with the task of insuring the safe, sanitary, and reasonably adequate care of those usually unable through age or infirmity

2

to care for themselves, the Department has been directed to enact rules and regulations to see that only those capable of properly caring for residents are issued licenses. Miss. Code Ann. § 43-11-13(1) (Rev. 2004). The Department of Health licensing division has performed this rulemaking mandate, and those rules and regulations were included in the record.

¶5. Rule 102.4 defines a Change of Ownership to include, but not be limited to, inter vivos gifts, purchases, transfers, leases, cash and/or stock transactions or other comparable arrangements. *Miss. Dep't. of Health Rules, Regulations, and Minimum Standards for Institutions for the Aged or Infirm*, 15-301-045 Miss. Code R., Rule 102.4 (2004), available at http://www.msdh.state.ms.us/msdhsite/ static/resources/119.pdf. (last visited Sept. 8, 2009). Thus, when the Department of Health notes that a change of ownership has occurred, it does not necessarily mean that any property actually has been sold.

¶6. "License" is defined as the document issued by the licensing agency and signed by the Department of Health constituting authority to receive residents and perform the services included within the scope of the rules, regulations, and minimum standards. *Id.* at Rule 102.13. A "licensee" is defined as the person to whom the license is issued and upon whom rests the responsibility for the operation of the institution in compliance with the rules, regulations, and minimum standards. *Id.* at Rule 102.16.

¶7. Rule 104.01 requires each facility meeting the requirements to hold a license. *Id.* at Rule 104.01. Rule 106.02 requires that separate licenses for each institution be maintained on separate premises, even if they are under the same management. *Id.* at Rule 106.02. Mississippi Code Section 43-11-9(1) provides for annual renewals, and the Department of Health set March 31 as the end of any given licensure year under Rule 106.05. Miss. Code

Ann. § 43-11-9 (Rev. 2004); 15-301-045 Miss. Code R., Rule 106.05 (2004). Thus, licenses are valid for one year only, from April 1 of any given year to March 31 of the following year. *Id.*

¶8.     Licenses are not transferable, and any proposed changes require a new application be made. Specifically, Rule 106.04 provides that:

> 106.04: License Not Transferable. The license for a facility is not transferable or assignable to any other person except by written approval of the licensing agency and shall be issued only for the premises named in the application. The license shall be surrendered to the licensing agency on change of ownership, licensee, name or location of the institution or in the event that the institution ceases to operate as a facility. In event [sic] of change of ownership, licensee, name or location of the facility, a new application shall be filed.

*Id.* at Rule 106.04. Additional authority is cited in the discussion below, where appropriate.

## FACTS AND PROCEDURAL HISTORY

¶9.     Since the 1940s, Jones County has operated a facility, on land owned by the county, known at various times as the Jones County Home for the Poor, the County Home, and the Jones County Home for Indigents ("the Home"). In 1952, the Jones County Board of Supervisors ("the Board" or "the Board of Supervisors") determined that the old facility was inadequate and that, in the public interest, a new facility should be built. The Board of Supervisors issued public bonds and began accepting bids for its design and construction. The contract for building the new Home was awarded in August of 1952. The record is not clear as to the date of the actual construction, but there is no dispute that a new Home was built at the same location.

¶10.    The Board of Supervisors employed Howard "H.A." Smith as caretaker for the Home in January of 1952. Although the record is not clear as to which party initiated the

4

transaction, the Board minutes show that in November of 1964, the Board of Supervisors considered and accepted a proposal to lease the Home to H.A. Smith. The Board meeting minutes read in relevant part:

> There came on for consideration the matter of leasing certain property of the County on which heretofore has been operating the Jones County Home for the care and keeping of old, infirm, or indigent persons, and the Board finds that it is authorized by Section 2997-01, Miss. Code 1942, Recompiled, in its discretion to lease lands and buildings owned by the County which are being used, or intended to be used as a County Home, to any person for the purpose of using such land and buildings for the care and keeping of old, infirm, or indigent persons, and the Board finds that it would be in the best interest of the County for its County Home to be leased to an individual, and having determined that H.A. Smith is desirous of leasing said premises for the purpose caring for and keeping of old, infirm or indigent persons of Jones County and for no other purpose, and the Board, after carefully considering said matter . . . and finding that such leasing was advantageous to the county, does now find that the president of the Board of Supervisors, H.H. Bryant, should be and is hereby authorized, empowered and directed to execute for and on behalf of the Jones County Board of Supervisors . . . [a lease of the premises.]

¶11.    The agreement leased the Home to H.A. Smith for six months in return for a rent of $1, renewable for successive six-month periods, for the specified purpose of "operating a home for the care and keeping of old, infirm or indigent persons who are resident citizens of Jones County, Mississippi." If at any time the facility ceased being used for that purpose, the lease was to become null and void. H.A. Smith was also required to obtain a license to operate an institution for the aged or infirm as defined by then-Section 6994-01 of the Mississippi Code of 1942, and failure to do so would render the lease null and void. The County agreed to make necessary repairs to the property and to pay for light, heat, and water for the Home.

¶12.    Just a few months later, in January of 1965, the lease was amended to include a provision whereby the Board of Supervisors agreed to contribute $800 per month to the Home. This contribution was "for the purpose of defraying costs of utilities, including light, heat and water and for the further purpose of providing medical attention and treatment for the inmates of said County Home."

¶13.    Although many agency records apparently were destroyed by a serious flood in 1979,[1] there does not appear to be any dispute among the parties that H.A. Smith obtained the necessary license to operate the Home, with License No. 160 being so designated. Apparently, the lease between the Board of Supervisors and H.A. Smith was renewed for successive periods of time. At some point, the rent to be paid was increased, and the $800-per-month support paid by the Board ended.

¶14.    This arrangement continued until approximately 1973, with annual rent increases being the only substantive change to the lease terms. There appears to be no dispute that, between 1965 and 1973, H.A. Smith properly maintained License No. 160 on the Home.

¶15.    At some point, H.A. Smith retired from running the facility, and in 1973, his son, Charles Smith, was set out as the lessee. The new lease with Charles Smith also included a provision whereby the contract could be cancelled by either party with thirty days' written notice. Although no record appears to exist, there is no dispute that Charles Smith also properly maintained License No. 160 on the Home.

---

[1] The earliest record of any license being issued for the Home is 1980.

¶16.    In 1974, the lease was amended to provide that the lessee, Charles Smith, was responsible for providing the utilities for which the Board of Supervisors previously had been assigned responsibility. Otherwise, the lease remained virtually unchanged for several years.

¶17.    In 1981, 1983, and 1985, Charles Smith sought permission from the Mississippi Department of Health, as required by law, to increase the bed capacity of the Home. On the first two occasions, the question of whether a certificate of need ("CON") would be required was not raised by either Charles Smith or the Department of Health, and apparently, none apparently ever issued. Smith did inquire in 1985 whether a CON would be required for the requested increase in beds. However, the Department of Health determined that the capital amount to be expended on the bed addition did not meet the necessary threshold requirements for a CON, and therefore, none was ever issued.

¶18.    For the 1985 addition, Charles Smith asked the Board of Supervisors to approve the addition to the Home of six new beds at a cost of $50,000. The Board agreed to have the county engineer and architect, Mr. Hall, prepare plans for submission to the Mississippi Health Care Commission.[2] In June of 1985, Charles Smith proposed to the Board of Supervisors that he take out a loan to fund the addition rather than have the Board issue bonds, raise taxes, or borrow money in anticipation of taxes. In exchange, Charles Smith would receive a rent abatement for six years and an extension of the lease.

_____

[2] The Mississippi Healthcare Commission was dissolved by statute effective July 1, 1979 and replaced by the Mississippi Department of Health. Miss. Code Ann. §§ 41-7-171 to 41-7-209 (Rev. 2005).

7

¶19. The proposal, slightly modified, was accepted by the Board of Supervisors, and an Extension and Amendment of Lease Agreement was executed between the parties on June 20, 1985, extending the lease until December of 1991. In this agreement, the arrangement for Charles Smith to fund the addition was included, with the improvements to become the property of Jones County, contingent upon a four-year extension of the lease on the same terms and conditions except as set out in the Extension and Amendment. The Extension and Amendment also required, for the first time, that Charles Smith maintain a comprehensive general liability insurance policy of $1,000,000, with Jones County and the Board of Supervisors included as additional insureds, and that Smith indemnify and hold harmless Jones County from liability.

¶20. In 1991, a Second Extension and Amendment of Lease Agreement was executed by the parties. In this agreement, Charles Smith agreed to pay the Board of Supervisors a specified rent, plus an additional $100 per month for each bed which might be added to the Home. All other terms and conditions of the lease remained unchanged.

¶21. Also in 1991, Charles Smith requested a CON from the Department of Health to add two more beds to the Home's capacity, for a final capacity of 122 beds. Again, because the cost of the increase did not meet the threshold requirements set out by the Department of Health, no CON was required for the addition, and none was ever issued.

¶22. In 1995, the parties entered a five-year renewal of the lease. The contract was substantially different in appearance but included essentially the same terms and conditions as the previous lease, with the following exceptions: (1) for the first time, the lease spelled out that no alterations, additions, or improvements could be made without the express written

8

consent of the Board of Supervisors; that any alterations, additions, or improvements made would become the property of the Board, or the Board could order the alterations, additions or improvements removed and the property returned to substantially the same condition as at the commencement of the current lease; (2) Charles Smith was affirmatively obliged to keep the property in good repair; (3) any failure by Charles Smith to perform contractual obligations would result in the lease being rendered null and void after a reasonable opportunity for him to cure the default; and (4) Charles Smith was given authority to assign or sublease his interest to Donna Zumwalt, contingent upon her successfully obtaining a license; but all other assignments or subleases were prohibited without the Board's prior written consent.

¶23.    Licensing records show that License No. 160 was issued for the Home with Charles Smith as the named licensee from 1980 to 1995. The licensure records show that a change of the licensee occurred effective January 1, 1995, and a new License No. 160 was issued for the remainder of the licensure year – January 1, 1996, to March 31, 1996 – with Donna Zumwalt named as the licensee.[3] This is consistent with a "notice" letter sent by Zumwalt to the Mississippi Department of Health, dated October 30, 1995. The letter notified the Department of Health of Zumwalt's intent to "purchase [the] Jones County Rest Home from [her] father, Mr. Charles Smith." The letter stated that Zumwalt would "also be assuming the Lease with the Jones County Board of Supervisors," said transaction to become effective

---

[3] Donna Zumwalt is the daughter of the then-lessee, Charles Smith, and the granddaughter of the original lessee, H.A. Smith.

9

January 1, 1996. Zumwalt renewed License No. 160 from year to year until the end of licensure year 2002 (see below).

¶24. The first lease entered into between the Board of Supervisors and Zumwalt as the named lessee (rather than a permissive sublessee) was executed on November 20, 2000, for a term of five years, to expire on December, 31, 2005. Other than the definition of "an institution for the aged or infirm" being updated to reflect the language of the 1972 Code, and the rent increases, the terms and conditions remained essentially unchanged from the prior lease.

¶25. In February of 2002, the Board minutes reflected a request by Zumwalt to assign her lease agreement for the Home to Larry Fortenberry of Daleson Enterprises ("Daleson"). The Board of Supervisors took the matter under advisement, and the Board entered an order consenting to the assignment on February 25, 2002.[4]

¶26. The Department of Health received an initial application for licensure from Daleson on March 26, 2002, the end of licensure year 2002. Licensure records reflect a new License

---

[4] "[I]f the lessee parts with his entire interest in the term, it constitutes and assignment, not a subletting, although the transfer is in form a sublease." *Weeks v. Cal-Maine Foods, Inc.*, 522 So. 2d 725, 727 (Miss. 1987) (quoting *Johnson v. Moxley*, 113 So. 656, 657 (Ala. 1927)); *see also* 49 Am. Jur. 2d Landlord and Tenant § 918 (2006) ("[I]f the lessee conveys the entire term and thereby parts with all reversionary interest in the property, the transaction is construed to be an assignment.). In this case, the Board minutes make it clear that the transfer to Daleson was an assignment and not a sublease. Thus, even though Zumwalt's appellate brief describes the transfer to Daleson as a sublease, because the transfer to Daleson was for the entire remaining period of Zumwalt's lease, it constituted an assignment, and Zumwalt held no reversionary interest in the home.

No. 160 was issued for the home with Daleson named as the licensee,[5] effective April 1, 2002, the first day of the new licensure year.

¶27.  By May of 2003, the Board of Supervisors had begun receiving complaints from members of the community regarding Daleson's management of the Home, and the Board sent a letter to Daleson regarding its concerns.  The complaints concerned Daleson's policy requiring residents to purchase medications from businesses outside Jones County, poor upkeep and lack of cleanliness of the facility, and a general state of disrepair.  Eventually, the Board of Supervisors resolved not to renew the lease with Daleson.  Instead, the Board decided to lease the Home to South Central Regional Medical Center ("SCRMC") when the lease with Daleson expired on its own terms on December 31, 2005.

¶28.   SCRMC applied for and obtained a license for the Home on December 21, 2005.  The Department of Health wrote Daleson on that same day, advising that it had received notice of a change of ownership effective January 1, 2006, and directed Daleson to return its license to the Department of Health, per Rule 106.04.  *See* 15-301-045 Miss. Code R., Rule 106.04.  Daleson was further notified that the license previously issued to him would no longer be effective as of January 1, 2006.

¶29.   The seeds of the present controversy were sown in early 2005, when Daleson met informally with some members of the Board of Supervisors, demanding that the Board build a new structure for the Home.  At that meeting, Daleson made claims of ownership to the

---

[5] The new License No. 160 listed Larry Fortenberry, individually, as the licensee. However, for the sake of clarity and understanding, Fortenberry and Daleson Enterprises will hereinafter be referred to collectively as "Daleson."

11

Home and threatened to remove the Home from the county if a new building was not erected. As a result of this informal meeting, counsel for the Board of Supervisors wrote to the Department of Health asking it to clarify who owned the CON for the Jones County Rest Home.[6]

¶30.    Sam Dawkins, Director of the Office of Health Policy and Planning in the Department of Health, answered the Board's letter on March 28, 2005.  Dawkins told counsel that, because the Home was built before the CON laws were put into effect in 1979, no such certificate had been issued to the Home.  Dawkins referred counsel to another individual in the Department of Health for questions regarding licensing or ownership of the facility.  The Board's counsel apparently wrote again to the Department of Health for an opinion as to who owns the Home.  With this second correspondence, the Board's counsel attached various documents, including the 1984 lease between the Board of Supervisors and Charles Smith, the 1995 lease renewal, the 2002 Board order approving the assignment to Daleson, various Board minutes, and the lease agreement between Zumwalt and Daleson.

¶31.    On May 23, 2005, Dawkins responded to the Board's letter.  Dawkins again wrote counsel for the Board of Supervisors and expressed the Department of Health's conclusion, based upon a review of the leases and other documents, that there was no evidence or indication that the Home had ever been sold by the Board or any evidence of any purchase by Zumwalt.  The letter once again noted that, because the Home was built and operating

---

[6] The record does not contain any explanation why any party believed the Department of Health would be able to answer these questions.

12

prior to enactment of the 1979 CON laws, no certificate had ever been issued, but rather, the Department of Health considered such facilities to have a "historical certificate of need."

¶32. At some point in 2005, Daleson Enterprises filed for bankruptcy. Daleson eventually entered into a stipulation with the Board of Supervisors that it would turn over possession of the property to the Board and/or the new operator and allow access to the facility to permit uninterrupted care and service to the residents. In exchange, Daleson would be paid for the personalty in the facility.

¶33. For reasons not developed in the record, the Board of Supervisors determined that it was necessary to file for an emergency restraining order against Zumwalt. Apparently fearing Zumwalt's interference with the operation of the facility, the Jones County Chancery Court granted the Board's petition for the emergency restraining order. In granting the order, the court stated that it had been advised that Zumwalt intended to pursue some type of action to gain authority to continue to operate the Home and to challenge to the Board's purported right to do so.

¶34. On December 29, 2005, Zumwalt's counsel wrote the Department of Health, providing notice "that at the close of business on December 31, 2005, Zumwalt, by way of its leasee [sic], is banking its 122 skilled nursing facility beds." The letter further stated that, although Daleson held a leasehold interest in the license, Zumwalt was the actual owner of the nursing home license and that neither Zumwalt nor Daleson had approved a change of ownership for the license or otherwise abandoned, surrendered, or relinquished their rights.

¶35. The appeal before us originates from a complaint filed by the Board of Supervisors and SCRMC in the Hinds County Chancery Court, seeking a declaratory judgment, a

13

temporary restraining order ("TRO"), and a permanent injunction against Zumwalt. The complaint sought a declaration that: (1) the Board owned the Home and, by virtue of its "historical CON," retained the right to operate the Home; (2) neither Zumwalt nor Zumwalt, Inc., possessed a valid license to operate the Home; (3) Daleson had voluntarily relinquished and forfeited its license via the stipulated agreement in bankruptcy court; and (4) neither Zumwalt nor Zumwalt, Inc., had any successor interest through transfer or assignment in the license to own the Home.

¶36. Via the answer, Zumwalt asserted counterclaims against the Board of Supervisors and the Department of Health, alleging: (1) conversion of "the furniture, supplies and fixtures owned by [Zumwalt and/or Zumwalt, Inc.] and used or maintained in the Facility" and "conversion of the legal authority to operate the facility;" (2) tortious interference with business relations by claiming entitlement to License No. 160, conversion of property and property interests, and enticement of employees, thus constituting a tortious interference with Zumwalt and/or Zumwalt, Inc.'s contractual relations with the facility residents and employees; and (3) civil conspiracy, for the acts described in (1) and (2). Zumwalt also sought a declaratory judgment that she was the legal owner of License No. 160 and the 122 nursing home beds licensed thereunder.

¶37. Following trial, the chancellor issued an order and opinion finding that the Board of Supervisors held a "historical CON," including the rights otherwise conferred by a CON to operate the Home. The chancellor further concluded that Zumwalt's license had expired by its own terms on March 31, 2002, that Zumwalt had made no application to renew or obtain another license, that her sole interest in the Home had been as a lessee, that the lease

14

agreement under which that interest had arisen had expired, and that the Department of Health was within its authority to issue License No. 160 to SCRMC.

¶38.   Finally, the chancellor concluded that Zumwalt had failed to comply with the notice provision of the Mississippi Tort Claims Act, and that, when Zumwalt assigned her interest in the Home to Daleson, Zumwalt had transferred all operating rights, licensing authority, and assets associated with the Home to Daleson.  The chancellor further noted that if any of Zumwalt's personal property located in the Home had been converted, Zumwalt's claim, if any, was against Daleson, who had sold the personalty to SCRMC.

¶39.   From this order, Zumwalt asserts three issues on appeal: (1) whether Jones County holds a "historical" certificate of need for the Home; (2) whether the Department of Health could deprive Zumwalt of the license without due process of law; and (3) whether Zumwalt is entitled to damages against Jones County, the Department of Health and/or SCRMC.

¶40.   We find the issue of "ownership" of the nursing home license to be dispositive of this case, but we will address the other issues for the sake of clarity.

**STANDARD OF REVIEW**

¶41.   This Court will not disturb a chancellor's factual conclusions unless they are manifestly wrong or clearly erroneous.  *In re Estate of Grubbs v. Woods*, 753 So. 2d 1043, 1046 (Miss. 2000).  For questions of law, this Court applies a de novo standard of review. *In re Will of Clarice Temple Carney v. Carney*, 758 So. 2d 1017, 1019 (Miss. 2000).[7]

---

[7] Both parties, as well as the chancery court, seem to believe the standard of review applicable to this case is that applied to appellate review of agency decisions.  However, the only agency involved, the Department of Health, took no action for this Court to review under any standard.  What is being appealed is the chancellor's findings of fact and

## DISCUSSION

I. **Whether the Department of Health could deprive Zumwalt of her license without due process of law.**

¶42. Zumwalt argues that the Department of Health deprived her of valuable property without due process of law. Zumwalt argues that she owns License No. 160, having purchased it from her father in 1996, and that she merely leased her interest in the license to Daleson. That interest, Zumwalt argues, reverted to her upon Daleson's bankruptcy filing. Zumwalt objects to the chancery court's finding that Zumwalt's license was surrendered upon the assignment to Daleson and that Zumwalt therefore lost any right to the license. Zumwalt asserts that this conclusion was a misunderstanding of "the ministerial nature of 'issuing' a license." She asserts that she was deprived of her property, which was worth $750,000, the amount Daleson agreed to pay for the license.

¶43. Zumwalt also appears to argue that she owns the Home's "operating authority" by virtue of owning License No. 160. Zumwalt's trial testimony indicates that she believes the license and "operating authority" are independent of, and can be separated from, the physical facility presently housing the Home, and can be relocated to another physical location without the consent or approval of the Board of Supervisors. At a hearing on the TRO requested by the Board, Zumwalt's counsel explicitly stated the following: "Judge, they have a license, which license can be relocated to any place else in the county to another facility that qualifies in the State."

---

conclusions of law on the declaratory judgment action and counterclaims.

¶44. Finally, Zumwalt asserts that her ownership of the license is supported by the fact that the Board of Supervisors never held a license for the Home, while her family has done so continuously since 1964.

*A.    Zumwalt's ownership of License No. 160*

¶45. Zumwalt asserts that professional licenses convey a property interest of which she may not be deprived without due process. She relies upon caselaw which holds that professional licenses confer valuable property rights. *See, e.g., **Montalvo v. Miss. State Bd. of Med. Licensure***, 671 So. 2d 53, 57 (Miss. 1996), and ***Broady v. Miss. State Bd. of Architecture***, 936 So. 2d 441, 447 (Miss. App. 2006) (Southwick, J., concurring).

¶46. This Court previously has recognized the property rights inherent in some professional licenses. However, a nursing home license is not a professional license under Title 73 of the Mississippi Code. *See* Miss. Code Ann. § 73-1-1 to 73-69-1 (Rev. 2008). This Court has never before held that professional licenses outside of Title 73 confer property rights.

¶47. To the contrary, unlike professional licenses issued under Title 73 of the Mississippi Code, Mississippi always has treated licenses to operate particular types of businesses as privileges in which no constitutional property rights vest. ***Davis v. Sheppard***, 139 So. 2d 668, 670 (Miss. 1962). Such licenses confer only the privilege to do that which would otherwise be unlawful, and therefore, such licenses are subject to revocation. ***Allen v. City of Kosciusko***, 42 So. 2d 388, 389 (Miss. 1949).

¶48. Further, nursing home licensure laws are included in Title 43 of the Mississippi Code, which covers Public Welfare. As such, they were, by explicit legislative statement, enacted for the purpose of ensuring the welfare of nursing home residents. Miss. Code Ann. § 43-11-

17

3 (Rev. 2004). To accomplish that goal, each institution is required to be licensed, per the title of the applicable statute. Miss. Code Ann. § 43-11-5 (Rev. 2004).

¶49. Each rule promulgated by the Department of Health speaks of *facilities* or *institutions* being licensed to operate. *See* 15-301-045 Miss. Code R., Rules 102.16, 104.01, 106.02, and 106.04. As set out by rule, licenses are specific to institutions, not licensees. Even where one person manages multiple facilities, each facility must be licensed individually. *See* Rule 106.02. A license cannot be issued in the absence of a physical facility.

¶50. Thus, *institutions* and *facilities* are licensed to operate, and the *licensee* is the person who has taken out the license for a specific facility and agreed to be responsible for assuring that the facility is properly run. As stated above, the purpose of licensing nursing homes is to ensure the quality of care for the public welfare; nothing suggests that public welfare confers a benefit upon an individual licensee. That a licensee may reap profit while so licensed does not change this.

¶51. The Department of Health's understanding of this concept was apparent at trial, when the licensing director, Marilyn Winborne, testified repeatedly that the Department of Health does not apply the word "ownership" to a license.

¶52. Additionally, because licenses are specific to institutions at specific addresses, they are not portable and cannot be "relocated to any place else." Department of Health regulation 106.04 specifically requires a license be surrendered and a new application be made if a facility changes location, or even changes its name. 15-301-045 Miss. Code R., Rule 106.04.

18

¶53. In the instant case, Zumwalt obviously misapprehended the nature of a license.[8] Zumwalt testified repeatedly that she "owned" the license and retained "licensing authority," which she merely leased to Daleson, but which would revert to her upon expiration or other termination of the sublease. Zumwalt had no such authority. The only legally recognized "licensing authority" in Mississippi is the Department of Health, which provided sworn testimony that licenses cannot be leased. Licenses are issued by the State for a limited time only and for a specific, named institution at a specific address.

¶54. The collateral argument that ownership can be proven by the fact that Zumwalt's license number was the same as that issued to her grandfather, which was sold to her father and then to her, is also baseless. That the licensing agency designated License No. 160 specifically to the Home does not confer any additional rights upon Zumwalt merely because she once was a holder of License No. 160.

¶55. Similarly, there is no basis for the argument that ownership can be shown by the fact that the Board of Supervisors never held a license to operate the Home. Nursing home licensure was not required by law until 1953. Section 6964-03 of the Recompiled Code of 1942 provided that after July 1, 1953, no *person* was permitted to establish, conduct, or maintain an institution for the aged or infirm without a license. Miss. Code of 1942, Recompiled, § 6964-03 (emphasis added). However, this restriction did not apply to institutions owned, operated, and under the supervision of any governmental unit. Miss.

---

[8] When asked what document conferred "licensing rights" to her, Zumwalt identified the licenses issued to her. However, the licenses do not include any such ownership statements or confer any "licensing rights." Nothing on the license itself provides for ownership of a license, and certainly not in perpetuity.

Code of 1942, Recompiled, § 6964-01 (1958).  Only *persons* as defined by Section 6964-01 were required to be licensed; governmental units were not so required.[9]  At the time the Board of Supervisors managed the daily operations of the home (1942-1964), it did not need a license to do so.

¶56.  To the extent that an entity may be said to actually "own" any nursing home license, that "ownership" can only be said to lie with the State.  Thus, the State may, upon a proper showing by an applicant, allow use of the privilege the license confers to the applicant, or revoke, suspend, or deny any license pursuant to its regulatory authority.  Therefore, the chancellor did not err in finding that Zumwalt did not "own" License No. 160.

### B.     *Ownership of the Home*

¶57.  Zumwalt argues that she purchased the "facility" housing the Home from her father, Charles Smith,  in 1996.  Charles Smith testified repeatedly that he owned the Jones County

---

[9] Section 6964-01. Definitions – As used in this act –
(a) "Institution for the Aged or Infirm" means a place which provides group living arrangements for four or more persons who are unrelated to the operator and who are being provided food, shelter and personal care whether any such place be organized or operated for profit or not and which place is privately owned and operated.  The term "Institution for the Aged or Infirm" includes nursing homes, convalescent homes, and homes for the aged provided that these institutions fall within the scope of the definitions set forth above.  The term "Institution for the Aged or Infirm" does not include hospitals or clinics devoted primarily to providing medical services, mental institutions, or institutions for the aged or infirm which are owned, operated and under the supervision of any governmental unit.
(b) "Person" means any individual, firm, partnership, corporation, company, association, or joint stock association, or the legal successor thereof.
(c) "Governmental Unit" means the state, or any county, municipality or other political subdivision or any department, division, board or other agency of any of the foregoing.
Miss. Code of 1942, Recompiled, § 6964-01 (1958).

Rest Home, that "we owned the license," and that his father before him (H.A. Smith) had owned the Home.

¶58. The documents provided in the record do not support this assertion. In interpreting contracts, we look first to the four corners of the document in question. *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 284 (Miss. 2005). "An instrument that is clear, definite, explicit, harmonious in all its provisions, and is free from ambiguity" will be enforced. *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990).

¶59. The only documents dealing with any interest in the Home are the leases, described above, and the recorded minutes of the Board of Supervisors meetings regarding those leases. The only property interest in the Home ever conferred to Zumwalt, or to H.A. or Charles Smith, who preceded her as lessees, by any document in the record was a leasehold interest. By definition, a lease conveys no more than the right of possession and use of property in return for rent or other consideration. Black's Law Dictionary 406 (abridged 7th ed. 2000).

¶60. Here, the documents in question are clearly identified by their own terms as leases for designated periods of time. Nothing in the documents implies a sale of any interest in the Home, which had been operating for more than twenty years at the time of the first lease.

¶61. Additionally, the statutory authority under which the leases were made did not provide for the sale of the county Home. The Board of Supervisors minutes approving the lease specifically stated that the Board was proceeding under then-Section 2997-01 of the Code of 1942, which authorized any county, through its Board of Supervisors, to lease any property it owned for the care of "old, aged and infirm persons." Specifically, the statute read:

21

> The board of supervisors of any county in the state of Mississippi is hereby authorized, in its discretion, to lease or rent any lands or buildings owned by the county and being used, or intended to be used, as a county home and farm to any person, persons, or association for the purposes of using such land and buildings for the care and keeping of old, infirm, or indigent persons. At any time that such lands and buildings cease to be used for such purposes, then such lease shall automatically expire.

Miss. Code of 1942, Recompiled, § 2997-01 (1958).

¶62. The leases all contain language tracking this statute, including the provision that leases will automatically end if the property is no longer used for the designated purpose. Neither the leases themselves nor the statutory authority under which the Board of Supervisors proceeded conferred any ownership interest in any portion of the facility, nor did they call for or even recognize any "operating authority" or "licensing rights" which had been (or could be) separately purchased or sold.

¶63. There is simply no documentary evidence of any rights or property interest being sold. The Smith family leased the property with the obligation to run the property as a home for the care and keeping of old, infirm, or indigent persons. The Board of Supervisors contributed to the upkeep for a time. Presumably, however, when the facility became profitable, the Smiths paid rent to the Board thereafter but were not required to turn over any profits above and beyond the rent. This was an advantageous arrangement for the Smith family but did not vest in them ownership of the Home.

¶64. The unambiguous lease terms are to be enforced as written. *Pursue Energy Corp.*, 558 So. 2d 352. *See also Ferrara v. Walters*, 919 So. 2d 876, 882 (Miss. 2005). Therefore, the chancellor did not err in concluding that Zumwalt did not own any part of the Home.

C. *Due process*

22

¶65. On appeal, Zumwalt asserts that the Department of Health improperly abridged her right to due process of law by stripping her of her license without notice or hearing, and by refusing to hold a hearing after her counsel demanded one. This argument is without merit on two separate, independent grounds.

¶66. First, as discussed above, the license vested no constitutional property right in Zumwalt. Second, the licensing regulations provide that notice and a hearing are required before a license may be revoked or suspended, and before an application (either an initial application or a renewal) may be denied. *See* 15-301-045 Miss. Code R., Rule 107.01. The regulations require no such notice or hearing when a license period expires on its own terms. Thus, the opportunity for notice and hearing is contingent upon the agency actually revoking, suspending, or denying a license. The Department of Health took none of those actions in this case.

¶67. First, the licensing rules define a change of ownership to include the leasing of a covered facility. *See* 15-301-045 Miss. Code R., Rule 102.4. Upon any such change of ownership, the prior licensee is required to surrender the license issued in his or her name, and a new license is to be issued in the new licensee's name. *Id.* There is no language in the rule suggesting that, upon a change of ownership, surrendering a license is optional or that such a surrender affects a reversion of the license or the leasehold interest back to its previous holder.

¶68. When the Board and Zumwalt agreed to assign the Home to Daleson, this constituted a change of ownership under the Department of Health's rules. Daleson was required to apply for a license, and Zumwalt was required to surrender hers. It was not necessary for

Zumwalt physically to return the license to the Department of Health in this case, though, because of the timing of the assignment (discussed below). However, this does not alter the legal effect of surrender. Zumwalt admitted under oath that the Department did not revoke or take away her license, and it is undisputed that Zumwalt never applied for a new license.

¶69. Zumwalt claims that she only leased her license to Daleson. However, nothing in the rules permits a license to be "leased," and the licensing director testified that a license may not be leased. Zumwalt affirmatively caused the license issued to her to become invalid when she assigned her leasehold interest in the Home to Daleson. The Department of Health cannot be held accountable for Zumwalt's actions, or her mistaken belief that she "owned" a reversionary interest in a license that was required to be surrendered.[10]

¶70. Second, Zumwalt consummated the assignment with Daleson to become effective at the close of the license year, March 31, 2002, the day the license issued to Zumwalt was to expire. The license issued to Daleson was effective beginning April 1, 2002. The Department of Health took no action at all with respect to the license issued to Zumwalt. The license simply expired by its own terms, and a new licensee applied pursuant to the change-of-ownership requirements.

¶71. Given the absence of any action by the Department of Health either to revoke, suspend, or deny a license to Zumwalt, no notice or hearing was necessary or required. Thus, no due process violation occurred.

---

[10] Also, because Zumwalt assigned the lease to Daleson, as opposed to subleasing her interest in the Home, Zumwalt retained no reversionary interest in the Home either. *See supra,* note 4 and accompanying text.

**II.       Whether the Board of Supervisors held a "historical" Certificate of Need.**

¶72.    Zumwalt asserts that the chancery court erred in finding that the Board of Supervisors held a "historical" CON for the Home and therefore retained all rights to operate the Home, as well as authority to convey that right. Zumwalt argues that a CON merely allows a party to obtain a nursing home license, which is the actual authority conferred by the State to operate a nursing home.

¶73.    The Board of Supervisors asserts generally that, because it has always owned the facility and it has never conveyed anything but time-limited leasehold interests to it, the Board remains the sole party authorized to operate the Home under the CON laws.

¶74.    To the extent Zumwalt argues that a CON is not the mechanism by which the State confers authority to operate a nursing home, she is correct. The Mississippi Health Care Certificate of Need Law of 1979 requires a certificate of need to be issued by the Department of Health under various circumstances. These circumstances include: before a new healthcare facility is constructed, developed, or established; upon relocation of a healthcare facility or a portion thereof, or relocation of a facility's major medical equipment; upon a change in the existing bed complement of a facility; and upon a change in the ownership of an existing facility. Miss. Code Ann. § 41-7-191 (Supp. 2008).[11]

¶75.    Certificates of Need, by statute, are limited in duration and extent. They are valid only for a specific scope, location, and named person,[12] and are valid only for twelve months,

---

[11] The Fourth Circuit Court of Appeals analogized CONs to construction permits. ***Rutherford Hosp., Inc. v. RNH P'ship***, 168 F.3d 693, 698 n.6 (4th Cir. 1999).

[12] (p) "Person" means an individual, a trust or estate, partnership, corporation (including associations, joint stock companies and insurance companies), the state or a

with a possible six-month extension upon request. Miss. Code Ann. § 41-7-195(1)-(3) (Rev. 2005). Neither CONs nor the project/capital expenditure which is the subject of a CON may be transferred or assigned without the permission of the Department of Health. Miss. Code Ann. § 41-7-195(1) (Rev. 2005).

¶76. Nursing homes are included in the definition of a health care facility subject to the CON statutes. Miss. Code Ann. § 41-7-173(h) (Rev. 2005). However, nothing in the certificate of need statutes confers any operational authority of nursing homes. By its own enabling statutes, the CON laws apply only to the construction, development, or establishment of health care facilities. Authority to operate a nursing home is under the aegis of the Department of Health, as well, but through licensure, not CONs. Miss. Code Ann. §§ 43-11-1 to 43-11-27 (Rev. 2004).

¶77. As explained by the Department of Health, the term "historical CON" merely denotes a facility which was constructed and had been operating prior to enactment of the 1979 CON laws, and as such, its operator never had been issued an actual CON for its construction, development, or establishment. In other words, the Home is allowed to exist without ever having had a CON issued because the Home existed before CONs were required. No other authority is granted by a CON.

¶78. Thus, to the extent that the chancellor found a correlation between the legal authority of the Home to exist, pursuant to a CON, and the authority for it to be legally operated, with the right to transfer that authority by way of a CON, this was an error of law. It was,

_____

political subdivision or instrumentality of the state. Miss. Code Ann. § 41-7-173(p) (Rev. 2005).

26

however, a harmless error, as the correct conclusion was reached, and it plays no part in our resolution of this case.

**III.   Whether Zumwalt is entitled to damages from the Board of Supervisors and/or SCRMC.**

¶79.   By way of her answer, Zumwalt asserted counterclaims for conversion and tortious interference with contracts and business relations. Specifically, Zumwalt alleges that the Board of Supervisors and/or SCRMC converted the personalty left in the Home when the lease was assigned to Daleson, that they converted her property rights in License 160, and that they interfered with her contractual business relations with her employees and the residents of the Home.

¶80.   The chancery court ruled that Zumwalt had failed to comply with the Mississippi Tort Claims Act ("MTCA") notice provision before asserting her claims, and that they were therefore not properly before that court. *See* Miss. Code Ann. § 11-46-11 (Rev. 2002). Despite this, the chancellor also ruled that when Zumwalt had assigned her interest in the Home to Daleson, Zumwalt had transferred all operating rights, licensing authority, and assets associated with the Home to Daleson. Though not specifically stated by the chancery court, the implication of this finding appears to be that the transfer of rights to Daleson included any claim for damages.

¶81.   The MTCA does not apply to all claims against governmental entities. The Act provides specific exclusions to its protections and requirements, and each claim must be examined for MTCA application.

¶82. With respect to the claim of tortious interference with business relations and/or contracts, the MTCA does not apply. The MTCA provides immunity for the alleged torts of governmental entities. Miss. Code Ann. § 11-46-3 (Rev. 2002). However, the MTCA waives that immunity, and the governmental entity is liable, for injuries caused by the entity or its employees while acting in the course and scope of their employment. Miss. Code Ann. § 11-46-5(1) (Rev. 2002).

¶83. Certain intentional torts are excluded from the MTCA's waiver of immunity. Subsection (2) of Mississippi Code Section 11-46-5 provides that torts constituting fraud, malice, libel, slander, defamation, or any criminal offense other than traffic violations are not within the course and scope of employment. Miss. Code Ann. § 11-46-5(2) (Rev. 2002). Thus, these intentional torts are outside the scope of the MTCA's waiver of immunity, and the MTCA does not apply.

¶84. Tortious interference with business relations and contracts requires proof of malice as an essential element. *Par Industries, Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998), and *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 16 (Miss. 2007). Therefore, the MTCA does not apply to these torts, and any legal action against a governmental employee for these intentional torts must necessarily proceed against him or her as an individual.

¶85. To the extent the chancellor determined that notice was required before pursuing claims of tortious interference with either business relations or contracts, this was error. However, it was harmless error, because, as discussed above, no facts were provided to support such claims.

¶86. Conversion, on the other hand, is an intentional tort that does not require proof of fraud, malice, libel, slander, or defamation. *Cmty. Bank of Ellisville, Miss. v. Courtney*, 884 So. 2d 767, 783 (Miss. 2004). Thus, conversion is an intentional tort arguably subject to the MTCA, so pre-suit notice to the governmental entity of such a claim generally is required. Miss. Code. Ann. § 11-46-11 (Rev. 2002).

¶87. However, we find it unnecessary to address whether Zumwalt failed to adhere to the MTCA's notice requirement for her conversion claim. Zumwalt has not shown any ownership interest in anything she claims was wrongfully converted by the Department of Health, the Board of Supervisors, or SCRMC.

¶88. No evidence was presented at trial of conversion by any party to the action. Zumwalt mostly complained about personalty left in the facility when she assigned her interest in the Home to Daleson (dishes, bed linens, items of furniture, etc.), but some of her testimony indicated she holds a much broader sense of what she owned. She claimed that she owned "the complete contents of the building, everything that it took to have a business of a nursing home." However, by the terms of the lease, any additions, improvements or alterations to the Home became part of the realty and the property of the lessor. Any such additions, improvements, or alterations did not belong to Zumwalt, and she holds no ownership interest to support a claim of conversion for any of them.

¶89. With respect to personalty, the only evidence adduced at trial was that Daleson sold all such items to SCRMC and retained the funds paid for the items. Zumwalt admits she was aware that Daleson had sold the items. Given that Daleson acted to impair Zumwalt's possessory rights (if any) in the personalty complained of, any claim for conversion would

29

lie against Daleson, not the Board of Supervisors, the Department of Health, or SCRMC, as the chancellor correctly pointed out in her order.

¶90. Zumwalt's final tort claim is that of conversion of Zumwalt's property rights in License No. 160. As discussed above, Zumwalt did not "own" License No. 160, in that the license did not confer upon her any property rights as to the license or any authority it conveyed. Even if it could be said that she "owned" the actual document constituting the license at some point in time, as of March 31, 2002, she had allowed her licensee status to expire, and a change of ownership was consummated with the assignment to Daleson. Thus, Zumwalt was required to surrender the license with her name on it, and she held no property rights to the license after that date, if any existed at any time.

## IV. Public policy

¶91. Within her argument regarding due process, Zumwalt also makes a public policy argument that the effect of the chancery court's rulings substantially impairs Mississippi's nursing home industry as a whole. Zumwalt argues that because the Legislature has imposed a moratorium on new nursing home facilities, no new beds or facilities are allowed. Miss. Code Ann. § 41-7-191(2) (Supp. 2008). Thus, the only way someone interested in entering the nursing home industry can do so is through the purchase or lease of an existing facility and the license to operate it. However, Zumwalt argues that owners of licenses will not want to lease the facility or the license, and such interested persons will not want to enter the lease, if at the end of the lease, the property rights and "operating interest" in the license are permanently forfeited because the Department of Health can simply award the license to

30

whomever it pleases. This, Zumwalt argues, will work a "mischief" on the nursing home industry.

¶92. There are several difficulties with this argument, most of which are discussed in detail above. First, no property rights "or operating authority" are conferred by nursing home licenses, and licenses cannot be leased. Therefore, the Department of Health is taking nothing away from a lessor or lessee when it issues a license to a successor of a lessee, and the disincentive to provide care, to which Zumwalt refers, does not arise. Owners, lessors, and lessees of facilities have every opportunity to reapply for a license. The implied argument that the Department can arbitrarily pick among competing applicants has no basis in fact or law.

¶93. Further, Zumwalt has provided no support, besides speculation and conjecture, as to any negative effect of the Legislature's policy decision to restrict the opening of new nursing homes. Miss. Code Ann. § 41-7-191(2) (Supp. 2008). Owners of existing nursing homes, like Jones County, are still free to lease or sell their facilities as they deem appropriate, with the limitation that new owners or lessees are required to obtain licenses from the Department of Health. The chancery court's decision has no impact upon this.

## CONCLUSION

¶94. The chancery court was correct in its conclusion that Zumwalt held no property interest in License No. 160 or the Jones County Rest Home. The decision of the chancery court is, therefore, affirmed.

¶95. **AFFIRMED.**

31

**CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**